GLOBE INDEMNITY COMPANY ET AL. *v.* VICTILL
CORPORATION

[No. 69, October Term, 1955.]

574

*Decided January 10, 1956.*

The cause was argued before BRUNE, C. J., and DELA-
PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Joseph O. Kaiser* and *Paul Berman,* with whom were
*Paul M. Higinbothom, Sigmund Levin* and *Theodore B.
Berman* on the brief, for appellants.

*Franklin G. Allen,* with whom were *Michael P. Crocker*
and *Piper & Marbury* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This action in tort was brought in the Baltimore City
Court by Globe Indemnity Company, a body corporate,
and Louis M. McDermott against Victill Corporation, a
body corporate, and Robert S. Doiel to recover for per-
sonal injuries which were inflicted by Doiel in an assault
upon McDermott in the Mayfair Hotel on December
22, 1951.

McDermott, who was an employee of the Bethlehem
Steel Company, was also employed on week-ends as night
clerk in the lobby of the hotel. Doiel, who was 27 years
old, gave his address as Iowa, although his wife and
child were in Wisconsin. He arrived at the hotel on
December 17 with a crew of salesmen employed by Vic-
till Corporation, a body corporate of Illinois engaged in
the sale of magazines and reference books.

On Saturday night, December 22, at about 6:30 o'clock,
Doiel, whose room was on the second floor of the hotel,
called a bellboy to bring him some whiskey and a pitcher
of ice. When the bellboy arrived with it, Doiel asked
him what was wrong with the switchboard. The bellboy
explained that the night clerk was acting as the switch-
board operator, and that Saturday was a busy day. At
about 7 o'clock Doiel tried to phone a member of the
crew on the third floor. As there was no answer, he came
down to the lobby to make a complaint. He told McDer-
mott that he was a guest there and wanted service. Mc-
Dermott said that he was doing the best he could. There-
upon Doiel "swung" at McDermott, and McDermott

ducked behind the desk. One of the women in the lobby rebuked Doiel for his vile language, whereupon he apologized and explained that he was "just having a little fun for the holidays."

At about 8:30 o'clock Doiel, having finished dinner, went back to his room. He again called the room on the third floor. When the night clerk informed him that there was no answer, Doiel exclaimed that his call was important, that he wanted to get some information to make up a report to the company. The clerk repeated that he was sorry but that no one answered. Immediately afterwards Doiel rushed into the lobby. McDermott was behind the desk counting pennies. He had an adding machine and a cup of coffee on top of the desk. Doiel took a couple of "swings" at him, and climbed on top of the desk. McDermott described the assault and battery in these words:

"I reached up, pushed him off, and he landed outside of the counter in the lobby. So I got up * * * and he came swinging again, and to protect myself I took the adding machine and held it in front of me to guard me. So finally he gets up on the counter again and in grabbing the adding machine I guess I spilled the coffee, and also spilled about 200 pennies around, and meantime he gets back up on the counter and finally made it over and I was standing back towards the key rack. * * * He landed me on his back, * * * and while on his back he was working his feet and one foot came up and caught me right in the leg. * * * I felt my leg give way, and I couldn't stand up. * * * So I went down and got in a compartment * * * back under the desk, and I crawled in there, and he kept calling me vile names and gets down and is punching me all over the head and finally banged me by the neck, pulled me out, held me and gave it to me over the eye."

578

Within five minutes a policeman arrived on the scene as a porter was cleaning blood spots from the floor. The officer saw that McDermott was limping and had a laceration near the left eye. Doiel came forward and said that he was the man who was responsible. The officer called an ambulance to take McDermott to a hospital and took Doiel to a police station.

In January, 1952, Doiel was found guilty by Judge S. Ralph Warnken in the Criminal Court of Baltimore on the charge of assault and battery, and was sentenced to the Baltimore City Jail for a term of one year. In March, 1952, Judge Warnken received a letter from Victor Yacktman, president of Victill Corporation, recommending that Doiel be paroled. In that letter Yacktman said:

"Bob Doiel worked with us a few months when, because of his leadership, ability and integrity, we promoted him to Field Manager. In this capacity his duties were those of appointing and field-training sales representatives on our combination offers of national magazines and reference books. * * * Bob seemed to be appreciative of his opportunities and kept reinvesting his savings to build up his operation. He was well under way when this regrettable incident occurred. When we got the details of Bob being picked up for assault and battery, we saw to it that he was represented by an attorney. * * *

"We would certainly be willing to reinstate Bob to his position with the company and to do all that we could to assure his success. We will also be glad to co-operate with the authorities by submitting a report of his activities in the event he should be paroled, or if the Parole Board should wish to place him in our custody, in view of his traveling activities, we will likewise be happy to make a periodic report to the Board as to Bob's behavior and attitude."

Judge Warnken asked the Probation Department in Baltimore to procure information concerning Doiel's record with the corporation. The judge's request was referred to the Probation Department in Chicago. In replying to that Department, Yacktman gave the following report:

"You also asked whether Doiel owed us any money. When he was promoted to manager— prior to his difficulty in Baltimore—we advanced him a few hundred dollars. During the processing of this case, we invested $300.00 additional in liquidating his organization, attorney fees and other miscellaneous items, so that he does owe us $1,100. * * *

"One of our managers was on the scene of action, and we are inclined to feel that Mr. Doiel's penalty was extremely severe. Judging by our experience with him, we believe that he does deserve an opportunity to prove himself, that he will make a good citizen and will restrain himself in every way possible to avoid trouble in the future."

It appears from the record that McDermott applied to the State Industrial Accident Commission for workmen's compensation, and the Commission found that he had sustained an accidental injury arising out of and in the course of his employment, and awarded his compensation for temporary total disability and permanent partial disability resulting in 55 per cent loss of use of the left leg and disfigurement of the face. Globe Indemnity Company, the employer's insurer, instituted suit under the section of the Workmen's Compensation Act which provides that where injury or death for which compensation is payable under the Act was caused under circumstances creating a legal liability in some person other than the employer to pay damages, and compensation is claimed and awarded or paid, the employer, if he is self-insured, or the insurance company, association or the State Accident Fund, may enforce for their

benefit, as the case may be, liability or such other person. Code Supp. 1955, art. 101, sec. 59.

At the close of plaintiff's testimony in the instant case, the Court directed the jury to render a verdict in favor of Victill Corporation. The jury rendered a verdict in accordance with that instruction, and a verdict in favor of plaintiffs against Doiel for the sum of $18,000.

This appeal was taken by plaintiffs from the judgment entered upon the verdict in favor of Victill Corporation. Plaintiffs did not contend that the corporation authorized or ratified the assault, nor did they contend that the corporation knew that Doiel had a vicious propensity that might incite him to commit an assault. They contended that the jury should have been permitted to decide (1) whether Doiel was a servant of the corporation, and (2) whether he was acting in the course of his employment. They argued that the evidence was legally sufficient to warrant the inference that the assault grew out of Doiel's work as field manager in preparing a report for the corporation.

In the law of agency, it is the basic general rule that a master is liable for the acts which his servant does with the actual or apparent authority of the master, or which the servant does within the scope of his employment, or which the master ratifies with the knowledge of all the material facts. This rule is founded upon the maxims of the common law, *"qui facit per alium facit per se,"* which indicates the legal identity of the principal and his agent, and *"respondeat superior,"* which indicates the tort liability of the principal. The law considers that the master holds out his servant as competent and fit to be trusted, and thereby he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment. *Tome v. Parkersburg Branch R. Co.,* 39 Md. 36, 70, 71, 17 Am. Rep. 540; *Western Maryland R. Co. v. Franklin Bank,* 60 Md. 36, 44; *New England Mutual Life Insurance Co. v. Swain,* 100 Md. 558, 60 A. 469; *Jones v. Sherwood Distilling Co.,* 150 Md. 24, 132 A. 278.

The courts based the master's liability for his servant's torts upon the doctrine of agency. They announced the test of the master's liability to be whether there was authority, express or implied, for doing the tortious act. If the act is done by the servant within the scope of his employment and in the accomplishment of objects within the line of his duties, the master will be held liable for the act. If, on the other hand, the servant steps aside from the master's business to do an act not connected therewith, the relation of master and servant for the time is suspended. *Hardeman v. Williams*, 1907, 150 Ala. 415, 43 So. 726; *Ward v. Pullman Co.*, 1908, 131 Ky. 142, 114 S. W. 754, 25 L. R. A., N. S., 343.

In 1889 Justice Gray delivered the opinion in the leading case of *Singer Manufacturing Co. v. Rahn*, 132 U. S. 518, 10 S. Ct. 175, 33 L. Ed. 440, which dealt with the negligence of the driver of a horse and wagon selling sewing machines on commission. It was held in that case that, since the driver acted under the direction, rules and instructions of his employer, he was a servant, and therefore his employer was liable to third persons for his negligence committed in the course of his employment.

It is important to distinguish between a servant and an agent who is not a servant, because ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by an agent who is not a servant. An agent is a person who represents another in contractual negotiations or transactions akin thereto. A servant is a person who is employed to perform personal services for another in his affairs, and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control. Persons who render service but retain control over the manner of doing it are not servants.

We reaffirm the rule that a principal is not liable for any physical injury caused by the negligent conduct of his agent, who is not a servant, during the performance of the principal's business, unless the act was done

in the manner authorized or directed by the principal, or the result was one authorized or intended by the principal. A principal employing an agent to accomplish a result, but not having the right to control the details of his movements, is not responsible for incidental negligence while such agent is conducting the authorized transaction. 1 *Restatement, Agency,* sec. 250.

There have been innumerable decisions dealing with the status of the salesman who travels about in a territory, varying in size from a part of a city to several States, peddling his principal's or master's goods or services. In *Carlson v. P. F. Collier & Son Corporation,* 190 Wash. 301, 67 P. 2d 842, upon which plaintiffs relied, the defendant, a magazine company, was engaged in a drive for subscriptions. The drive was conducted in connection with a premium offered to subscribers. The company's manager in Seattle organized a crew of solicitors to conduct the drive in a certain territory. The company agreed to provide the means of transportation for the solicitors. It was compulsory for them to use the designated automobile. They stayed at the same hotel and started out together each morning in the automobile. They were compelled to work on a schedule because they were followed the next day by a verifier, whose duty it was to check the orders and distribute the premiums to the subscribers, and the subscriptions had to be forwarded immediately to the office in Seattle in order to carry out the offer made by the company. The Court held in that case that the trial judge did not err in submitting to the jury the question whether the crew manager was the servant of the company. But it was clear that he was subject at all times to the directions of the corporation's office as to where he would work, as to what territory he would cover, and as to how he would canvass it.

In recent years the courts with increasing frequency have been holding salesmen not to be servants. *Wesolowski v. John Hancock Mutual Life Insurance Co.,* 308 Pa. 117, 162 A. 166; *Atlas Life Insurance Co. of Tulsa*

*v. Foraker,* 196 Okla. 389, 165 P. 2d 323; *American National Insurance Co. v. Denke,* 128 Tex. 229, 95 S. W. 2d 370, 107 A. L. R. 409; *Stockwell v. Morris,* 46 Wyo. 1, 22 P. 2d 189.

Mechem gives the following explanation of this trend of the decisions:

> "Insurance salesmen have been conspicuous in the picture but by no means to the exclusion of sewing machine salesmen, washing machine salesmen, used car salesmen, and the like."

> "The disputed cases are commonly alike in one regard: the salesman drives his own car in performing his function and the injury results from his negligent driving. (Were the salesman driving his employer's car, the inference of control would be strong, and he would likely be held a servant.) Where he goes about on his feet, the cases are very scarce, no doubt because of the small risk created by the pedestrian salesman. * * * Fuller brush and vacuum cleaner salesmen, going on foot, appear to have been servants in most of the few cases involving them." *Mechem, Outlines of Agency,* 4th Ed., sec. 446.

In 1933 this Court in *Regal Laundry Co. v. A. S. Abell Co.,* 163 Md. 525, 163 A. 845, considered the question whether a newspaper reporter for the Baltimore Sun was a servant of the newspaper company. The reporter drove his own automobile, for which the company allowed him a certain amount per mile as expenses. His automobile collided with another car while he was on his way to the newspaper office for further instructions. The Court held that he was a servant of the company, and made it clear that the mere fact than an automobile which is negligently operated by a servant does not belong to the master will not preclude the plaintiff from recovering damages from the master where the circumstances warrant the inference that the act was within the scope of the servant's employment.

A different result was reached in *Washington News Company v. Satti,* 169 Md. 489, 182 A. 286. There it appeared that a salesman who solicited orders on a commission basis, using his own automobile, received no directions from the company as to his work or as to the time and route thereof. It was held in that case that, since the salesman worked whenever he chose, he was not a servant of the company, but an independent contractor.

In the case at bar plaintiffs relied on the testimony that Doiel was required to render reports to the corporation. But the mere rendition of reports to an employer does not establish that the employee is under such control as to make him a servant. It has been held that the fact that an employer reserves the right to supervise the work of an employee merely for the purpose of determining whether it is being done in accordance with the contract does not preclude the relationship of independent contractor. *Larson v. Centennial Mill Co.,* 40 Wash. 224, 82 P. 294, 111 Am. St. Rep. 904, 907.

Plaintiffs also called special attention to the letters which Yacktman wrote in March, 1952, when Doiel was in jail, recommending that he be given a parole. While those letters disclose that Doiel had been associated with the corporation, there is nothing in either letter or anywhere else in the record that shows that the corporation had exercised any control over him in his work.

It is generally accepted that a person who sues another to recover damages for an injury caused by a servant's tort has the burden of proving the essential facts necessary to create liability. The plaintiff, who alleges that his injury was caused by the defendant's servant, must prove (1) that the relation of master and servant existed between the defendant and the person who caused the injury, and (2) that the servant was acting within the scope of his employment or under express or implied authorization from the master. *Burns v. Michigan Paint Co.,* 152 Mich. 613, 116 N. W. 182; *Kohlman v.*

*Hyland,* 54 N. D. 710, 210 N. W. 643, 50 A. L. R. 1437; 35 *Am. Jur., Master and Servant,* sec. 594.

In the instant case there was no evidence that the corporation had assigned any particular territory to Doiel; no evidence that the corporation directed the transportation of any of his crew; no evidence that he was required to work on any particular days or for any particular hours; no evidence that there was any supervision over his selection of members of the crew or even that their names were known to the corporation.

Where the evidence on the question whether the relation of master and servant existed is conflicting or more than one inference can be drawn from the evidence, it is a question of fact for the jury to determine whether the relation existed. But where there is no conflict in the evidence relating to the question and but one inference can be drawn therefrom, the existence of the relation is a question of law for the court. *Baltimore Transit Co. v. State, to Use of Schriefer,* 184 Md. 250, 265, 40 A. 2d 678; *Joseph v. United Workers Ass'n,* 343 Pa. 636, 23 A. 2d 470; *Rice v. Builders Material Co.,* 120 W. Va. 585, 2 S. E. 2d 527; *Burlingham v. Gray,* 22 Cal. 2d 87, 137 P. 2d 9.

As there was no evidence in the instant case that the corporation exercised control over Doiel in his work, plaintiffs failed to establish that he was a servant of the corporation. Moreover, it was undisputed that Doiel's tort was not authorized or ratified by the corporation.

In view of our decision that Doiel was not a servant of the corporation, it becomes unnecessary to discuss whether his tort was within the scope of his employment.

For the reasons we have stated, we hold that the Court below acted correctly in directing a verdict in favor of the corporation. We will therefore affirm the judgment entered upon the verdict.

*Judgment affirmed, with costs.*