660 A.2d 423

**Willie James OAKS et al.**

v.

**Anna CONNORS et al.**

**No. 113, Sept. Term, 1994.**

Court of Appeals of Maryland.

June 26, 1995.

26

Charles E. Gallagher, Jr. (Neil J. MacDonald, DeCaro, Doran, Siciliano, Gallagher, Sonntag & DeBlasis, on brief), Lanham, Margaret Fonshell Ward (William J. Jackson, P.C. Semmes, Bowen & Semmes, on brief), Baltimore, for petitioners.

Phillips P. O'Shaughnessy (Phillips P. O'Shaughnessy, P.A., Joseph A. Miklasz and Stacy O'Neil, on brief), Glen Burnie, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case involves an employer's liability to third parties for the negligent driving of its employee while en route to the employee's usual place of work in the employee's personal vehicle. We must also determine whether the statutory cap on noneconomic damages, codified as Maryland Code (1974, 1989 Repl.Vol.) § 11–108 of the Courts and Judicial Proceedings Article, is to be applied separately to the claim of an injured spouse and a loss of consortium claim by the marital unit.[1]

## I.

On July 5, 1989, Petitioner Willie James Oaks (Oaks) was on his way to work when he was involved in a motor vehicle accident with a van in which Anna Connors (Connors) was a passenger.[2] Earlier that day, there had been a thunderstorm, which left a substantial amount of water on Maryland Route 176. As Oaks drove through this water at an excessive rate of speed, he lost control of his car, crossed the center line, and

---

**1.** Unless otherwise indicated, all statutory references are to the Courts Article.

**2.** The driver of the van, Martha Marris, and her husband also sued Oaks for their injuries resulting from the accident; however, the Marrises' claims are not involved in this appeal.

hit the vehicle in which Connors was riding. Connors, who was married at the time, was severely injured as a result of the collision, sustaining several fractures to her right hand and arm in addition to serious neurological and psychological damage. She was also rendered incapable of caring for her invalid husband in the same manner as before the accident.

On July 5, Oaks was employed by Giant Food, Inc. (Giant) as an Automated Teller Machine (ATM) Sergeant in its Loss Prevention Department, a position he had held since April 17, 1989. His duties in that capacity varied, sometimes requiring him to stay at the corporation's Jessup facility all day, and other times requiring him to proceed to various Giant stores to stand guard while ATM machines were being serviced. To fulfill this latter task, Giant required Oaks to have a personal vehicle, in good working order, available to use when travel was necessary. Giant did not supply or pay for the vehicle or for its maintenance, fuel, or repair. It also did not specify the type of vehicle to be used or the route to be taken to and from the Jessup facility.[3]

Beginning April 17, Oaks reported to Jessup each day to receive his daily work assignment. At the time of the acci-

---

3. The evidence in the record establishes that Oaks was not entitled to travel expense reimbursement on July 5. Giant's clearly-stated policy on the date of the accident in question reads as follows:

"For associates regularly traveling for Giant (an average of two or more days a week) you may report the mileage from your nearest Giant store, all business mileage in between, plus mileage back to the originating nearest store. An assignment to one location for more than two months does not constitute travel; it is a commuting expense, and may not be claimed for mileage reimbursement."

As an ATM Sergeant, Oaks traveled regularly between stores for Giant and, therefore, qualified for travel mileage reimbursement from his home store to his initial reporting location, Jessup, for the first two months that he was assigned there; however, because Oaks began reporting to Jessup as an ATM Sergeant on April 17, 1989, his entitlement to reimbursement for his daily commute there ended on June 17, 1989, several weeks before the accident in question. Even assuming that Oaks was entitled to travel reimbursement on July 5, 1989, the case law shows that such an entitlement does not of itself create *respondeat superior* liability in Giant. *See Dhanraj v. Potomac Elec. Power Co.*, 305 Md. 623, 630, 506 A.2d 224 (1986).

dent, he was operating his personal vehicle and was en route from his residence to Jessup. His scheduled hours on July 5 were from 3:00 p.m. to 11:00 p.m. and the accident occurred at approximately 2:42 p.m. Oaks testified that he was not performing any duties for Giant at the time of the accident, his understanding being that his work day began after he punched in at Jessup.

On April 3, 1990, Respondents Anna and Herbert Connors (collectively, the Connorses) filed a Complaint against Oaks and Giant, alleging that the employee's negligent operation of his motor vehicle caused the accident that injured Anna Connors. Connors sought damages for her individual personal injuries and she and her husband jointly claimed damage to their marital relationship. The case against Giant was based on its alleged *respondeat superior* liability for Oaks' negligent driving in the course of his employment.

A jury trial was held in the Circuit Court for Anne Arundel County. At the close of the Connorses' presentation of evidence, the court (Goudy, J.) granted Giant's Motion for Judgment pursuant to Rule 2–519, finding that *respondeat superior* liability did not apply in this case.[4] As to Oaks, at the conclusion of all the evidence, the jury awarded Anna Connors economic damages of $84,200 and noneconomic damages of $350,000; it also awarded the Connorses $130,000 for the noneconomic damage to their marital relationship. Following the verdict, the court reduced the judgment to comply with § 11–108, the cap on noneconomic damages, stating that "the law requires [it] to find the damage to the marital relationship [in this case to be] non-economic and, accordingly, the [Connors] claim must necessarily be reduced by $130,000." To accomplish this end, the court vacated the Connorses' loss of consortium award and reduced it to zero. Judgment was then

---

**4.** According to Maryland Rule 2–519(b), when a motion for judgment is made after the close of the plaintiffs' case in a jury trial, the court must consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

entered against Oaks in favor of Anna Connors in the amount of $434,200.[5]

The Connorses appealed from the judgment in favor of Giant and from the part of the judgment vacating their loss of consortium award. In *Connors v. Oaks*, 100 Md.App. 525, 642 A.2d 245 (1994), the intermediate appellate court reversed the lower court's judgment for Giant, finding it vicariously liable for Oaks' actions under the theory of *respondeat superior*, and ordered the reinstatement of the Connorses' loss of consortium award pursuant to its construction of § 11–108, permitting a separate noneconomic damages cap for a consortium claim. We granted certiorari to consider the important issues raised in this case.

## II.

The doctrine of *respondeat superior*, in Maryland, allows an employer to be held vicariously liable for the tortious conduct of its employee when that employee was acting within the scope of the employment relationship. *Dhanraj v. Potomac Elec. Power Co.*, 305 Md. 623, 627, 506 A.2d 224 (1986). *See also Embrey v. Holly*, 293 Md. 128, 134, 442 A.2d 966 (1982); *Restatement (Second) of Agency* § 219 (1958). We have held that " 'a master is liable for the acts which his servant does with the actual or apparent authority of the master, or which the servant does within the scope of his employment, or which the master ratifies with the knowledge of all the material facts.' " *Dhanraj, supra*, 305 Md. at 627, 506 A.2d 224 (quoting *Globe Indemnity Co. v. Victill Corp.*, 208 Md. 573, 580, 119 A.2d 423 (1956)). Because "the master holds out his servant as competent and fit to be trusted, ... he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment." *Globe, supra*, 208 Md. at 580, 119 A.2d 423.

---

**5.** The Connorses elected this resolution in response to the court's order that their aggregate noneconomic damages award be reduced by $130,-000 to comply with § 11–108.

This rule has been somewhat modified with respect to the use of automobiles. In *Dhanraj,* we stated:

"[O]n account of the extensive use of the motor vehicle with its accompanying dangers, the courts have realized that a strict application of the doctrine of *respondeat superior* in the modern commercial world would result in great injustice.... It is now held by the great weight of authority that a master will not be held responsible for negligent operation of a servant's automobile, even though engaged at the time in furthering the master's business unless the master expressly or impliedly consents to the use of the automobile, and ... had the right to control the servant in its operation, or else the use of the automobile was of such vital importance in furthering the master's business that his control over it might reasonably [be] inferred."

305 Md. at 627–28, 506 A.2d 224 (quoting *Henkelmann v. Metropolitan Life Insurance Co.,* 180 Md. 591, 599, 26 A.2d 418 (1942)). The "right to control" concept is key to a *respondeat superior* analysis in the motor vehicle context. The doctrine may only be successfully invoked when an employer has either " 'expressly or impliedly, authorized the [servant] to use his personal vehicle *in the execution of his duties,* and the employee is in fact engaged in such endeavors at the time of the accident.' " *Id.* at 628, 506 A.2d 224 (quoting *L.M.T. Steel Products v. Peirson,* 47 Md.App. 633, 643, 425 A.2d 242, *cert. denied,* 290 Md. 717 (1981) (emphasis added)). *See also Embrey, supra,* 293 Md. at 134, 442 A.2d 966 (stating that *respondeat superior* liability "rests upon the power of control and direction which the superior has over the subordinate"); *A. & P. Co. v. Noppenberger,* 171 Md. 378, 390–92, 189 A. 434 (1937); *Regal Laundry Co. v. A.S. Abell Co.,* 163 Md. 525, 531–33, 163 A. 845 (1933); *Goldsmith v. Chesebrough,* 138 Md. 1, 8, 113 A. 285 (1921); *Restatement (Second) of Agency* § 219 cmt. a (1958) (stating that "[a] master's liability to third persons appears to be an outgrowth of the idea that within the time of service, the master can exercise control over the physical activities of the servant").

■ Driving to and from work is generally not considered to be within the scope of a servant's employment because getting to work is the employee's own responsibility and ordinarily does not involve advancing the employer's interests. *Dhanraj, supra,* 305 Md. at 628, 506 A.2d 224. *See also Restatement (Second) of Agency* § 229 cmt. d, 235 (1958). Accordingly, we have held that "absent special circumstances, an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling to or from work." *Dhanraj, supra,* 305 Md. at 628, 506 A.2d 224.

■ Giant argues that it should not be liable to the Connorses for Oaks' negligent driving while he was en route to his usual job site in his personal vehicle, even though it required him to have the vehicle available for use during the work day. It contends that the theory of *respondeat superior* does not apply in this case because Oaks was not acting within the scope of his employment at the time of the accident. According to Giant, the case law makes clear that employees traveling to or from work in a personal vehicle are acting for their own purposes and, therefore, their employers should not be held liable for their actions during this time.

It is undisputed that while Giant required Oaks to have a vehicle available for use in the execution of his duties, he was not actually performing any of his designated job responsibilities at the time of the accident. While driving to work, Oaks was not furthering any business purpose of Giant; his job assignments were limited to either fulfilling security-related duties at the Jessup facility or guarding ATM machines at various Giant stores as they were being serviced. He was accomplishing neither of these tasks at the time of the accident. Moreover, Oaks' work day did not even begin until he arrived at Jessup, punched in, and received his daily work assignment; the accident occurred before the time that Oaks was scheduled to start work on July 5.

Furthermore, Giant exerted no control over the method or means by which Oaks operated his vehicle. It did not supply

or pay for the vehicle that Oaks used or for its maintenance, fuel, or repair. It also did not specify the type of vehicle to be used or the route to be taken to or from the Jessup facility. Finally, the use of an automobile was not of such vital importance in furthering Giant's business that Giant's control over it, as Oaks commuted to work, can reasonably be inferred.

The Connorses argue that Oaks was in fact executing his duties for Giant at the time of the accident because he was transporting to the job site a vehicle which Giant required him to have available for use in the course of his employment. The Connorses seek to analogize this situation to that involved in the workers' compensation case of *Alitalia v. Tornillo*, 329 Md. 40, 617 A.2d 572 (1993), which dealt with the "going and coming" rule, finding compensable injuries to have been sustained by an employee in an accident that occurred while the employee was driving home from work in a car required for use in his employment. Unlike the instant case, however, the employee in *Alitalia*, Tornillo, was an "outside sales representative" for an airline. His primary business-related duties included selling tours and travel packages to travel agencies, visiting existing clients, distributing travel brochures and promotional materials to attract new customers, attending weekly sales meetings, and running occasional errands for his employer, which required him to travel throughout the Maryland–Virginia area on a daily basis. Tornillo admitted to frequently making sales calls on his way to and from his home in Rockville. In addition, after approving his choice of vehicle, Alitalia assisted Tornillo in financing the car, which was to be used to fulfill the conditions of his employment. Finally, Tornillo was reimbursed with a travel allowance for his business mileage. *Alitalia, supra*, 329 Md. at 42, 617 A.2d 572. We believe that these factual differences clearly distinguish *Alitalia* from the case at hand.

### III.

A claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one

spouse through the tortious conduct of a third party. *Deems v. Western Maryland Railway Company,* 247 Md. 95, 100, 231 A.2d 514 (1967). *See also Klein v. Sears Roebuck,* 92 Md.App. 477, 493, 608 A.2d 1276, *cert. denied,* 328 Md. 447, 614 A.2d 973 (1992) (setting forth the possible injuries that a married person may sustain as a result of a third party's tortious conduct, which include "(1) the physical injury to the spouse who was directly injured by the tortious conduct and (2) the *derivative* loss of society, affection, assistance, and conjugal fellowship to his or her spouse"). A comprehensive discussion of the consortium claim was set forth by this Court in *Deems* in which we held that damage to the marital relationship is a compensable injury. We further concluded that a consortium claim must be filed jointly by a couple and tried concurrently with the claim of the physically injured spouse in order to avoid duplication of awards. 247 Md. at 109–11, 231 A.2d 514. *See also Phipps v. General Motors Corp.,* 278 Md. 337, 354–56, 363 A.2d 955 (1976); *Travelers Indem. Co. v. Cornelsen,* 272 Md. 48, 50, 321 A.2d 149 (1974) (stating that our decision in *Deems* "created a new substantive right . . . [and] delineated a different procedural approach in actions for loss of consortium. Nevertheless, it gave rise to no new cause of action").

■  Maryland's cap on noneconomic damages is codified as § 11–108; it provides that "[i]n any action for damages for personal injury . . . , an award for noneconomic damages may not exceed $350,000." § 11–108(b). It further states: " 'Noneconomic damages' means pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury" and "does not include punitive damages." [6] § 11–108(a). One of the primary purposes in enact-

---

6. In 1994, the General Assembly revised § 11–108. The new amendments, one of which raised the statutory limit on noneconomic damages to $500,000, went into effect on October 1, 1994 and thus are not directly applicable in the instant case. ch. 477 of the Acts of 1994. The 1994 revision also clarified that the cap was to apply in wrongful death actions. Finally, it stated that the new cap "shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim." § 11–108(b)(3).

ing this statutory limitation was to promote the availability and affordability of liability insurance in Maryland. *See Murphy v. Edmonds*, 325 Md. 342, 368, 601 A.2d 102 (1992) (stating that § 11–108 was enacted "in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State" caused in part by excessive noneconomic damage awards in personal injury cases); *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325, 1327 (D.Md.1989).

Oaks argues that both the plain meaning of the language of § 11–108 and its legislative history show that the General Assembly intended for a single cap to apply to the individual claim of an injured person and a loss of consortium claim by the marital unit, which is derivative therefrom. He contends that including "loss of consortium" within the § 11–108(a) definition of noneconomic damages evidences this legislative intent. He further asserts that the ruling of the Court of Special Appeals in this case effectively doubles the amount of noneconomic damages recoverable in a personal injury action with a consortium claim, thereby frustrating the Legislature's purpose in enacting § 11–108. We agree.

The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature. *Fish Market v. G.A.A.*, 337 Md. 1, 8, 650 A.2d 705 (1994). *See also Jones v. State*, 336 Md. 255, 260, 647 A.2d 1204 (1994); *Parrison v. State*, 335 Md. 554, 559, 644 A.2d 537 (1994); *Rose v. Fox Pool*, 335 Md. 351, 358, 643 A.2d 906 (1994). The first step in determining legislative intent is to look at the statutory language and "[i]f the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Jones, supra*, 336 Md. at 261, 647 A.2d 1204. *See also Parrison, supra*, 335 Md. at 559, 644 A.2d 537; *Rose, supra*, 335 Md. at 359, 643 A.2d 906; *Outmezguine v. State*, 335 Md. 20, 41, 641 A.2d 870 (1994).

There is no indication in the literal language of § 11–108 that the Legislature intended to allow a separate cap for a

consortium claim. In fact, the General Assembly expressly chose to include "loss of consortium" in its definition of what constitutes noneconomic damages in a personal injury action, along with such other intangibles as pain, suffering, inconvenience, and disfigurement. § 11–108(a)(1). The plain meaning of this provision is that damages for loss of consortium should be governed by the same $350,000 limit as the other items enumerated in § 11–108(a)(1). It would be illogical to conclude that a separate cap should apply to loss of consortium damages and not to the damages awarded for the other items listed in § 11–108(a)(1) as the Connorses' argument would suggest.

Further evidence that a single cap was intended is the language of § 11–108(b), which clearly states: *"In any action for damages for personal injury . . ., an award* for noneconomic damages may not exceed $350,000." (emphasis added) The ordinary meaning of this language is that in each personal injury action, which includes the injured individual's underlying claim for damages along with all claims arising therefrom, a single award (*"an* award") of noneconomic damages should be made and should be subject to the statutory cap.

Finally, reviewing the statutory scheme within which § 11–108 was enacted, we note that § 11–109(b) states: "As part of the verdict in any action for damages for personal injury . . ., the trier of fact shall itemize the award to reflect the monetary amount intended for: (1) Past medical expenses; (2) Future medical expenses; (3) Past loss of earnings; (4) Future loss of earnings; (5) Noneconomic damages; and (6) Other damages." The fact that the Legislature was so methodical in its requirements for the itemization of damage awards, and yet still lumped all noneconomic damages into one category with no separate delineation for consortium versus non-consortium damages, is additional evidence that it intended for *all* noneconomic damages to be subject to a single cap.

The Connorses argue that the absence of statutory guidance as to the proper allocation of a noneconomic damage award between the injured spouse and the marital unit reveals that

the Legislature intended the imposition of separate caps in this situation. A decision to the contrary, they say, could make a claim for loss of consortium a meaningless procedural exercise and effectively eliminate this type of claim in cases where the injury to the victim spouse is serious enough to warrant a noneconomic damage award of $350,000 or more to that person alone. Since an award for "loss of consortium" presupposes the existence of an intact marital relationship that can be damaged, we believe that couples in this situation should be able to, and responsible for, deciding how to allocate the money they are awarded, which is precisely what occurred in the instant case.

The Connorses further contend that § 11–108 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights and infringes upon their right to a jury trial under Articles 5, 19, and 23 of the Declaration of Rights. We expressly rejected these constitutional arguments in *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), and we reaffirm that decision today. *See also Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325 (D.Md.1989).

Finally, the Connorses assert that, although they must be adjudicated concurrently, a claim for loss of consortium by the marital unit is separate and distinct from any claim made by the injured spouse and, therefore, should have its own cap. We believe that damages to a marital relationship are frequently inextricably intertwined with the harm sustained by the injured spouse. As we held in *Deems*, "marital interests are in reality ... interdependent [and] injury to these interests is ... essentially incapable of separate evaluation as to the husband and wife." 247 Md. at 109, 231 A.2d 514. For example, the pain, suffering, and depression that are personal to the injured victim will inevitably affect the relationship with that person's spouse. Whether these injuries are claimed individually, by the marital unit, or by both, however, they constitute noneconomic damages flowing from a single source, the tortious injury to the victim spouse.

Moreover, since half of the damages awarded under a loss of consortium claim belong to the injured spouse, allowing a separate cap for it would circumvent the Legislature's intent to limit noneconomic damages and avoid double recoveries because a married victim would be able to receive up to $525,000 in compensation for such damages, instead of the $350,000 allowed by the statute. Accordingly, we hold that a loss of consortium claim is derivative of the injured spouse's claim for personal injury and, therefore, a single cap for noneconomic damages applies to the whole action.

*AS TO APPELLANT GIANT FOOD, INC., JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DI-RECTIONS TO AFFIRM THE JUDGMENT OF THE CIR-CUIT COURT FOR ANNE ARUNDEL COUNTY IN FA-VOR OF GIANT FOOD, INC.*

*AS TO APPELLANT WILLIE JAMES OAKS, THAT PART OF THE JUDGMENT OF THE COURT OF SPE-CIAL APPEALS AWARDING LOSS OF CONSORTIUM DAMAGES TO APPELLEES VACATED; CASE RE-MANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THAT PART OF THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY DE-LETING IN ITS ENTIRETY THE AWARD OF LOSS OF CONSORTIUM DAMAGES TO APPELLEES.*

*COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY APPELLEES.*