39 A.3d 120

Yiannis YIALLOUROS, et al.

v.

John TOLSON.

No. 2773, Sept. Term, 2010.

Court of Special Appeals of Maryland.

March 2, 2012.

Rob N. Weston, Greenbelt, MD, for Appellant.

Thomas J. Bradley, Philadelphia, PA (McBreen & Kopko, Philadelphia, PA, Jeffrey T. Brown, DeCaro, Doran, Siciliano, Gallagher & DeBlasis, LLP, Bowie, MD), on the brief, for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI, LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On March 4, 2009, appellant, Yiannis Yiallouros,[1] filed suit in the Circuit Court for Montgomery County, against appellee, John David Tolson, and alleged that appellee was liable in negligence for damages, including pain and suffering, medical expenses, loss of present and future earnings, and loss of consortium. On April 28, 2010, the jury found in favor of appellant and awarded $32,000.88 for past medical expenses, $35,191.80 for past lost wages, $409,787.00 for loss of future wages, $224,010.16 for pain and suffering, and $224,010.16 for loss of consortium. Appellee filed a motion for remittitur or new trial, which the court granted. At the conclusion of a second trial, on August 18, 2010, the jury found that appellee was negligent but that appellant was contributorily negligent and so awarded no damages. The court denied appellant's motions for judgment notwithstanding the verdict and for new

---

1. Yiannis was joined in his suit and this appeal by his wife, Orthodoxia. We refer to them collectively as "appellant" for ease of reading.

trial on January 11, 2011, and appellant filed this timely appeal on February 4, 2011.

## QUESTIONS PRESENTED

Appellant presents the following questions, which we have edited to comport with our discussion:

I. Did the circuit court err when it ordered a new trial?

II. Did the circuit court err when it denied appellant's motion to strike appellee's expert testimony?

For the reasons that follow, we answer yes to question one, we do not address question two as our opinion renders it moot, and we remand the case to circuit court for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

On the night of March 15, 2006, appellant was on call as a maintenance worker for the Montgomery County Housing Opportunities Commission and traveling southbound on New Hampshire Avenue when he collided with appellee, who was turning left from the northbound lanes.

Appellant sustained a transverse fracture of the left patella with displacement, requiring open reduction and internal fixation surgery on March 23, 2006.[2] Appellant's recovery required physical therapy, during which he developed stress injuries to multiple bones in his left foot. At the conclusion of appellant's rehabilitation program, his therapist completed a functional capacity evaluation. The evaluation determined that appellant was restricted to occasional lifting of up to sixty-seven pounds and carrying up to forty-five pounds for one hundred feet, frequent lifting of up to forty-five pounds and carrying forty pounds for one hundred feet, continuous walking for no more than fifteen minutes, "limited" stair climbing, no ladder climbing, and no kneeling or crawling without knee pads.

---

2. The surgeon installed pins in the patella on either side of the fracture, then strung and tightened a metal wire between the pins to provide structural integrity.

Appellant had to use a walker, crutches, and a cane for several months before returning to "light duty" at work on February 19, 2007. But in March, the Housing Commission discharged appellant because there was no permanent light duty work and because appellant could no longer perform the tasks required by his normal position.

The Housing Commission's worker's compensation insurance carrier retained the services of Stuart Porter, an employment counselor with the GENEX company. He assessed appellant's vocational abilities and refined his resume to include his skills and experience—basic plumbing, carpentry, hardware, use of hand tools, restaurant management, cooking, and customer service. Appellant applied for work with several employers but secured no interviews or offers.

Appellant's suit came to trial on April 26, 2010. Appellant and his wife testified that, after the accident, appellant suffered from boredom and the frustration of knowing that he could no longer work outside or inside the home, no longer enjoy his daily walks with his wife, and no longer entertain their friends, as was their habit. Appellant's wife testified that they now argue more frequently and have considered separation and divorce.

Appellant called Dr. Jeffrey Phillips, an orthopedic specialist, who opined as to appellant's disability. On cross-examination, Dr. Phillips testified as follows:

Q. Okay, you mentioned on direct examination, I think near the end, that you thought that given Mr. Yiallouros' injury, he couldn't go back to his old work as a maintenance mechanic, is that right?

A. Correct.

Q. All right, but you also said that Mr. Yiallouros is capable of working, just not in that job, right?

A. Without a doubt.

Q. Okay, something that's a little less physically taxing, a little less bending, stooping, carrying, things of that nature, right?

A. Absolutely.

Q. So, it's not a situation where from a medical perspective, Mr. Yiallouros is totally unemployable, is that correct?

A. From an orthopaedic point of view—

Q. Yes.

A. —without a doubt, I agree with you.

On redirect, Dr. Phillips explained that his opinion was limited to appellant's physical capabilities: "... I don't know what his training allows him to do. Education, that's beyond my ability. I'm just talking about work based on his orthopaedic examination."

To complement Dr. Phillips' testimony, appellant offered the opinion of Lianne Friedman. Appellee chose not to conduct *voire dire* or to demand a hearing to determine her qualifications, and the court designated her as "an expert in the field of vocational rehabilitation counseling and employment." Friedman testified that she interviewed appellant and reviewed his medical history and capability assessments, and determined whether appellant could find employment in light of "what the labor market is and what the labor market requires and what employers are looking for." She then rendered her opinion, as follows:

A. It's my opinion because of a combination of factors, but mostly because of this injury, because of his knee and foot injury, he is not placeable or employable at this time. He sustained a total loss of earning capacity.

Q. Please explain to the jury what specifically is your basis for coming up with that opinion, that he is totally incapable of working?

A. Mr. Yiallouros only has a high school diploma from Cyprus. He doesn't have any college or additional training or education. The only jobs that he has ever had either in restaurant work or as a maintenance mechanic are very heavy jobs. They're not sedentary. They're not just sitting at a desk or getting up and moving around a little bit. You have to carry, lift, walk, do stairs, kneel, bend, stoop, work with tools.

And at his job at Housing Opportunities Commission, he did not have an assistant. He was, he did the work alone. So he's not able to perform any of those tasks anymore and what is required by the employer. Maybe he can still do some of those things, but he can't do all of them.

And in addition to that, if that weren't bad enough at this point, the—he's 61 now and the market, the labor market right now is so bad that no one is going to hire him, nobody. He doesn't have the skills or the physical capability to do the types of jobs that he knows how to do.

* * *

... And the jobs that he's had, restaurant work and as a maintenance mechanic are very physically stressful jobs and that's the only work he's ever done. And he doesn't have the kinds of transferrable skills like computer work or management or administrative work that could help him go back to work in a sedentary job, in a less physically stressful job. So he's not going to be able to work.

Q. He did some restaurant management, but that's, you don't think that's transferable?

A. Well, but it's, even as a restaurant manager, managers don't just sit there. They are right in there doing all the work beside their employees. So it's not the type of management work where you're just sitting in an office all day. He's out there working as well, along with his employees.

On cross-examination, appellee confronted Friedman with a document in which appellant's employment counselor asked appellant's treating physician to "indicate approval" of certain jobs. Appellant's physician had checked "Yes" next to all six listed positions: "School Bus Driver," "Cashier," "Rental Car Delivery Driver," "Shuttle Driver," "Security Console Monitor," and "Service Dispatcher." Friedman explained why, in her opinion, appellant was not qualified for those positions:

A. School bus driver. There are steps that—most buses you have to get up the steps throughout the day and he has problems with steps. You have to do some maintenance on

your vehicle and sometimes that might include bending and kneeling and crawling. So that's going to be a problem.

And I know that he did apply for that position and was never even called for an interview. You also have to have a certain license which he does not have to drive a school bus. But physically I don't think it's an appropriate job.

Q. Why not?

A. Well, because of the things that I just mentioned, going up and down steps and having to do some checks and maintenance on your vehicle as well.

Q. The school bus driver would have to deal with the children involved?

A. That too. In case of an emergency, he'd have to be able to react and help in an emergency and with a bad leg that would not be a good idea.

Q. Okay. Next, cashier.

A. Cashier, most cashiers that I know that I've worked with stand all day long. Very, very few get a place to sit. They're on their feet all day long. He can't do that.

Rental car delivery driver, you're sitting most of the day and that's difficult for someone with his limitations as well. The same thing, the shuttle driver has the same types of problems that the school bus driver has.

Security console monitor, those jobs are not out there. They are very, very few and far between and you have to have computer skills and he doesn't have any computer skills. And the same with service dispatcher, those are, those you need computer skills for and he doesn't have computer skills. And someone is not going to hire a 61-year-old and give him computer skill training when they can get someone who already has plenty of able-bodied people out there with lots of computer skills and experience in those positions.

He has no experience in those positions. So, for a variety of reasons, I understand why Mr. Porter may have targeted those, but I'm sure that if they got down to an interview, which I don't know if he had them or not, and he had taken

a detailed job description, he would not have been able to perform them either physically or because he doesn't have the education and experience or skills.

On re-cross examination, Friedman further explained that while appellant could potentially learn new skills, "at this age it's not worth the time or the expense because at his age he is not going to be hired for the types of jobs that he can physically do."

Appellant's other expert, Thomas Borzilleri, a Ph.D. economist, opined that the present value of appellant's future lost earnings was between $330,607.00 and $404,787.00.[3]

On April 28, 2010, the jury returned a verdict for appellant and awarded $32,000.88 for past medical expenses, $35,191.80 for past lost wages, $409,787.00 for loss of future wages, $224,010.16 for pain and suffering, and $224,010.16 for loss of consortium.

Appellee filed a motion for remittitur or new trial on the issue of damages. Appellee argued:

[T]he award for future lost wages [shocks] the conscience given the unreliability of the expert testimony on this issue, including the extent to which the opinion of total disability from employment offered by Ms. Friedman is entirely contradicted by the Plaintiff's own medical experts. Indeed, the issue of one's physical incapacity to be employed is a medical one, customarily within the sole province of a medical expert, and courts traditionally require contradictory medical evidence to rebut such opinions. In the instant matter, however, the Plaintiff merely presented the unsupported factual opinion testimony of a non-medical expert to rebut the uncontradicted medical opinions of Plaintiff's own medical experts, all within his own case-in-chief.

Ms. Friedman's opinions are unreliable and lack an adequate basis. She performed almost no analysis of plaintiff's

---

3. The expert made several assumptions that are not presently disputed, other than the obvious assumption that appellant had lost all earning potential.

vocational abilities or opportunities. There was no diagnostic testing and no determination of the specifics of alternative employment that might be available to plaintiff. Her opinions as to Mr. Yiallouros' inability to work in any occupation were directly contradicted by his treating physician, Dr. James Gilbert, as well as plaintiff's medical expert witness, Dr. Phillips.

Appellee further argued that the amount of non-economic damages awarded were "excessive and disproportionate to the injuries sustained."

At the conclusion of a hearing on June 16, 2010, the court ruled from the bench that Friedman's testimony had been admitted in error and required a new trial on liability and damages:

> The Court erred and the jury was improperly influenced by expert testimony of the vocational rehabilitation witness which the Court never should have admitted into evidence. She totally lacked any factual basis, much less an adequate factual basis for opinion under Maryland Rule 5–702 and 5–703. She gave basically a "because I said so opinion." It was interesting. I shouldn't have let it in, I did. The error is mine, I apologize. But it is nonetheless an error, which, in my judgment, so fundamentally affected the decision in this case as to warrant a new trial.
>
> * * *
>
> While it is certainly true that the plaintiff suffered an injury and suffered a serious injury, by all accounts of the competent medical evidence, he has recovered from his injury. And while it very well may be he may not return to his former line of work, he is a highly skilled individual. He ran a restaurant. He's done all manner of gainful employment since immigrating to this country for which he is to be commended. The notion that he is simply incapable or unemployable is, to be blunt, nonsensical.

The court also found that the jury's award of non-economic damages so grossly excessive that they shocked the conscience of the court:

I've already said the jury's finding of future lost wages of $409,787 is without factual basis, was predicated on improper, quote unquote, expert testimony and does shock the conscience of the Court.

The non-economic losses, exclusive of loss of consortium, were determined by this jury to be $224,010.16. It's an interesting number, but the Court finds it is irrational based on the evidence. It is against the evidence. It is against the weight of the evidence. It is excessive, as was the jury's conclusion that the marital unit should be awarded, interestingly enough, an identical amount for loss of consortium, $224,010.16.

\* \* \*

Before joining the bench, this member of the Court was for over a decade national litigation counsel for one of the largest entities on the planet. In that capacity, I either personally tried or supervised the trial of hundreds, it's probably bigger than that, but I don't want to overstate it, hundreds of tort cases in jurisdictions, including Maryland, all over the United States of America. In addition, I represented plaintiffs, not defendants, plaintiffs in complex cases in the State of New York, the State of Florida, the State of Maryland, and other states whose names escape me at this time.

Some of the venues were plaintiff friendly, others were more kind to the defense side of the equation, but each case and each trial was different. I have as both a trial lawyer and a trial judge seen low verdicts, high verdicts, and outlier verdicts. The verdict in this case, particularly on damages, was more than just a surprise. In legal parlance, the Court was, quote unquote, shocked, and for that reason the motion for a new trial is granted.

The court convened a second trial, and appellee demanded a hearing to determine Friedman's qualifications as an expert under Rule 5-702. Friedman testified—as she had during the first trial—that she holds a master's degree in rehabilitation counseling of the hearing impaired from Gallaudet University

and has over twenty years of experience in that field. In her work, she would assess her subject's capabilities and determine whether the subject needed and could complete vocational training, then she would attempt to find a suitable job. She testified that "95%" of her present work is related to litigation, but that it still requires these steps in each case. As to her assessment of *prospective* job opportunities, Friedman testified: "We also have to research the labor market to see if the jobs that we think are appropriate even exist in the labor market in sufficient numbers in order to place them. We work with employers and recruiters in order to find out what's available in the labor market." The court concluded the hearing by ruling that although there were "weaknesses in her predicate for rendering her opinion," it could not find that Friedman's opinion was without any factual basis, and that "those weaknesses can be fully fleshed out in cross-examination and otherwise but that the jury should not be deprived of her opinion."

During the second trial, appellee called Anthony Cornetto, an accident reconstruction expert, to testify. The court had ruled *in limine* that Cornetto could present his measurement of ground distances and his estimations of speed, stopping time, and stopping distance—including his assumptions of average reaction times—but that Cornetto *could not* give an opinion of what appellant otherwise could have done to avoid the accident. At trial, Cornetto gave several estimations of the distance and time it would have taken for appellant to stop at a given speed (and vice-versa) and with the assumption of normal reaction times. On cross-examination, counsel asked whether appellant could have taken longer than average to perceive appellee's truck, to which Cornetto replied: "No, because in this accident, if that was the case, it still would have been avoided." The court denied appellant's motion to strike this testimony on the grounds that it did not violate the court's ruling *in limine.*

At the conclusion of the second trial, the jury found that appellee was negligent but that appellant was contributorily negligent and awarded no damages. The court denied appel-

lant's motions for judgment notwithstanding the verdict and for new trial, and appellant filed this timely appeal.

### Discussion

 Appellant argues that the court erred when it granted appellee's motion for new trial. Nominally, the standard of review governing such a ruling is "abuse of discretion," but as applied to new trial decisions, the phrase takes on a meaning different from its ordinary use in describing appellate review. As the Court of Appeals explained in *Buck v. Cam's Broadloom Rugs*, 328 Md. 51, 58–59, 612 A.2d 1294 (1992):

> [T]he breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice.

The *Buck* Court went on to explain that the degree of deference that is to be extended reflects the general scheme of appellate review, *viz.*, it depends on the extent to which the decision rests on the trial court's particular knowledge and expertise:

> In the case before us, the range of discretion of the trial judge was necessarily at its broadest. The motion for a new trial did not deal with the admissibility or quality of newly discovered evidence, nor with technical matters. Instead, it asked the trial judge to draw upon his own view of the weight of the evidence; the effect of an accumulation of alleged errors or improprieties by defense counsel, no one of which may have been serious enough to provoke a request for, or justify the granting of, a mistrial; and the allegedly inadequate verdict, in determining whether justice would be served by granting a new trial. Under circumstances such as this, the power to grant a new trial is an equitable one in its nature. Because the exercise of discretion under these circumstances depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial,

complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal. It is that concept which led this Court in the past to state, albeit too broadly in the context of all motions for new trial, that such a decision is effectively unreviewable.

*Id.* at 59, 612 A.2d 1294 (internal citation and quotation marks omitted).

The trial court in this case held that it had erroneously admitted testimony from appellant's vocational expert, who lacked an adequate factual basis for her opinions. Appellee argues that the trial court's decision to grant a new trial was "wholly dependent upon [its] evaluation of the character of the testimony, [its] assessment of the credibility of the witnesses, and [its] assignment of weight to the evidence presented at trial," and concludes that the court's ruling is therefore "entitled to the broadest range of discretion." We disagree. It is not clear what formed the precise basis of the court's ruling, but the record presents three possibilities that demonstrate the distinction between evidentiary "weight" and "technical" matters, of which none are availing.

■ An ordinary fact witness merely states his or her recollection of past events, whereas an expert opinion draws from given facts to reach a conclusion that cannot be tested directly. In this case, for example, there was no way to determine at present what the future holds for appellant, and yet the law of damages entitles him to the benefit of his future earnings. *See Adams v. Benson,* 208 Md. 261, 271, 117 A.2d 881 (1955) (citing *McMahon v. Northern C. R. Co.,* 39 Md. 438 (1874); *Bannon v. Baltimore & O.R.R. Co.,* 24 Md. 108, 123 (1866)). Believing that question to be "beyond the ken of the average layman," *Schultz v. Bank of Am., N.A.,* 413 Md. 15, 28–29, 990 A.2d 1078 (2010), appellant called on an expert to predict appellant's future lost earning capacity based on her knowledge of appellant's abilities and market demand. Under Rule 5–702, her opinion required a "sufficient factual basis," which is the crux of the matter before us.[4]

---

4. Rule 5–702 states, in full:

Stripped to its essence, Friedman's opinion was a proposition, drawing a conclusion from a set of facts using logical inference. As such, it was subject to three primary criticisms, each falling along the spectrum of discretion: first, that the expert misrepresented her *knowledge* of the given facts; second, that the given facts are *objectively* untrue; and third, that the conclusion does not follow logically from the given facts.[5]

■ The first of these generic attacks on expert testimony is essentially a question of truthfulness that will ordinarily "depend upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice," thereby vesting the court with wide discretion. But in this case there was no indication or argument that Friedman was actively misrepresenting such fundamental matters as her *curriculum vitae* or the fact that she had studied and dealt with the relevant labor markets. *See In re Adoption/Guardianship of Tatianna B.*, 417 Md. 259, 268, 9 A.3d 502 (2010) (depth of the expert's

---

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

5. In logical parlance, the first two criticisms test whether the argument is "sound," while the third tests whether the argument is "valid." *See* Shapiro, Stewart, "Classical Logic," The Stanford Encyclopedia of Philosophy (Winter 2009 Edition), Edward N. Zalta (ed.), http://plato.stanford.edu/archives/win2009/entries/logic-classical/.

> Judge Moylan, writing for this court in *CSX Transp., Inc. v. Miller*, 159 Md.App. 123, 189, 858 A.2d 1025 (2004), couched the same concepts in the scientific terms of "data" (instead of soundness) and "methodology" (instead of validity):

>> Although Rule 5–702's third factor inquires, without further differentiation, "whether a sufficient factual basis exists to support the expert testimony," that factor consists of two distinct sub-factors. It is first required that the expert have available an adequate supply of data with which to work. It is then required that the expert employ a reliable methodology in analyzing that data.

experience with the subject goes to the weight of her testimony, not the admissibility of her testimony).

■ At the other end of the discretionary spectrum lies the third category of attack on expert opinion, "validity," which—to borrow a phrase from *Buck*—is a "technical" matter unobscured even after the record "cools" on appeal. Here, again, the court had no reason to pass judgment on such issues, for no one argued that it was impossible or impermissible to infer future market demand from knowledge of present conditions and trends, or that appellant's physical capabilities also could not be forecasted.[6]

■ Rather than attack Friedman's representations of her substantive knowledge, or the logical validity of her conclusions, appellee grounded his argument—and the court its ruling—on the substantive falsity of her "factual basis," taking as proof that her testimony contradicted several medical assessments of appellant's "capabilities." To that end, appellee correctly states that appellant "indicated that he believed he was physically capable of performing alternative employment," that Dr. Gilbert advised "that [appellant] was medically capable of performing" alternative employment, and that in Dr. Phillips' opinion appellant could work in a position that was "less physically taxing." But as appellant rightly argues, these are phantom contradictions. Ms. Friedman plainly opined that while appellant was *physically* capable of performing *many* jobs, he was *otherwise incapable* because he lacked the skill, training, and experience that those positions demanded.[7] Although appellant had considerable work experience,

---

6. As noted, above, the law clearly permits prognostication, and the court's assessment that Friedman's conclusion was "nonsensical" was, in effect, a contrary forecast.

7. Although appellee rightly notes that the evidence showed appellant to be "capable of performing tasks within the heavy physical demand category," appellee ignores the fact that appellant's capacity for heavy work was severely limited, leaving him unable to continue his previous employment and, in the opinion of appellant's expert, unable to be employed in any job for which he has adequate skill.

his expert testified that from her experience and knowledge of the labor market as well as various professional assessments of his physical limitations, appellant could no longer be employed in physically demanding jobs and he was not equipped with the requisite skills for sedentary employment. There simply was no contradiction between this opinion and the medical opinions given at trial, which were that appellant could—hypothetically—work in a sedentary position.

Two additional and related considerations bolster our opinion. The *Buck* Court held that "the failure of the moving party to object to an alleged error or impropriety at trial is a significant factor to be considered by the trial judge when that error is later argued in support of a motion for new trial. A motion for new trial should not be an opportunity to 'sandbag' an opponent, nor ordinarily to correct oversights that might have been remedied at trial if seasonably noted." 328 Md. at 62, 612 A.2d 1294. Appellee argues that the grounds for his new trial motion could not have been raised prior to the verdict because the weight of the evidence does not arise during the course of trial. But as we have seen, appellee's arguments did not indict the jury's *subjective weighing* of the evidence, but rather the *basis* for Friedman's opinion testimony, a matter that could have (and should have) been raised during trial. This was precisely the issue that the second trial court determined when appellee, having learned from experience, requested a *Frye/Reed*[8] hearing on Friedman's qualifications as an expert. After hearing at length from both parties, the court held that appellee's various attacks on her opinion— including the argument of interest that she contradicted other

---

We further note that there was no evidence to contradict Friedman's testimony that the education and training required to make appellant employable would be cost-prohibitive. And while appellee argues that appellant's condition may have improved during the year between those examinations and trial, this does not appear to have been raised or decided at trial, and in any event was a matter that appellee could have rebutted or brought to the jury's attention at trial.

8. *See Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978) (adopting the standards for expert qualifications set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)).

medical experts—were problematic but should nevertheless be developed at trial and submitted to the jury:

> We've spent a fair amount of time, I'm not saying it was not justified, regarding whether or not Ms. Friedman would be permitted to testify basically as she stated in her report.
>
> And the court finds it to be a very close call. There are clear, in the Court's view, weaknesses in her predicate for rendering her opinion but the Court cannot find that it is without any factual basis and accordingly, she may testify.
>
> And the Court finds that those weaknesses can be fully fleshed out in cross-examination and otherwise but that the jury should not be deprived of her opinion.

When the court granted appellee's new trial motion, it interjected itself and confused the weight of the evidence with its admissibility. As the second trial court determined, Friedman's many years of experience, her knowledge of the labor market, and her skill in performing employment assessments qualified her at least to *testify* before the jury so that it could weigh the evidence and reach a verdict. Whether the first trial court's operative error was an abuse of discretion in granting a new trial, or was the clearly erroneous finding that the expert testimony was contradicted and thus could not form a sufficient factual basis for any opinion, we must reverse.[9]

The question of *non*-economic damages, however, was an independent factual matter, and we have no reason to reverse the circuit court's ruling thereupon.[10]

---

**9.** Having held that it admitted Friedman's testimony in error and fearing that its decision improperly affected the jury's determination of negligence, the court exercised its discretion to grant a new trial on both damages and liability. *See Cavey v. Smec*, 256 Md. 483, 489, 260 A.2d 292 (1970) (where party had moved for new trial only as to damages, court had discretion "to grant a trial *de novo*, or to grant a new trial on the issue of damages only"). Because the court's post-trial ruling on Friedman's testimony was erroneous and was the only reason that the court granted a new trial on liability, the court's decision to retry liability must be reversed along with its decision to retry economic damages.

**10.** The non-economic damages include appellant's alleged loss of consortium. *Oaks v. Connors*, 339 Md. 24, 37, 660 A.2d 423 (1995).

The presiding judge drew from his many years of experience as a lawyer and a jurist, as well as his immediate observations of the relevant evidence, to conclude that the non-economic damages awarded were grossly excessive. The court's finding—and our holding—finds further support in the jury's unusual awards of damages for pain and suffering and for loss of consortium. Specifically, the jury awarded *precisely* $224,010.16 for each, an amount which, when added to appellant's economic damages, brings the total award to the round figure of $925,000.00. Neither the trial court nor we can escape the conclusion that the jury determined its award for economic damages and then awarded non-economic damages as an exercise in arithmetic "guesswork," failing to consider what amounts would actually compensate a reasonable person for the pain and suffering of his physical injuries, as a matter separate and distinct from any alleged loss of consortium.[11] *See Quality Discount Tires, Inc. v. Firestone Tire & Rubber Co.*, 282 Md. 7, 24, 382 A.2d 867 (1978) (citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946)).

For these reasons, a new trial should have been granted to retry only the issue of non-economic damages. We therefore vacate the judgment for appellee entered after the second trial, we reverse in part the court's ruling granting a new trial, and we remand the case for a new trial limited to non-economic damages or other proceedings consistent with this opinion.

**JUDGMENT FOR APPELLEE VACATED. ORDER GRANTING NEW TRIAL REVERSED IN PART AND AFFIRMED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

---

11. Because we vacate the second trial's judgment in favor of appellee, we do not reach appellant's second question, regarding appellee's accident reconstruction expert.