783 A.2d 169

**Mary Pat MARZULLO et al.**

v.

**Peter A. KAHL.**

**No. 10, Sept. Term, 2001.**

Court of Appeals of Maryland.

Oct. 12, 2001.

Carole S. Demilio, Deputy People's Counsel, and Peter Max Zimmerman, People's Counsel, Office of People's Counsel for Baltimore County, Towson; (J. Carroll Holzer of Holzer & Lee, Towson, all on brief), for petitioners/cross-respondents.

Michael J. Moran (Law Offices of Michael J. Moran, P.C., Towson); John B. Gontrum (Romadka, Gontrum & McLaughlin, P.A., Baltimore), all on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

Peter A. Kahl, respondent, used a parcel of land that was zoned R.C.4 for his residence and to operate Peter Kahl Reptiles, Inc. Mary Pat Marzullo and the People's Counsel for Baltimore County, petitioners, filed a Petition for a Special Hearing before the Zoning Commissioner of Baltimore County for the determination of whether an R.C.4 zone permits respondent to conduct his business—the breeding, raising, and selling of reptiles. The Zoning Commissioner determined that respondent's use was permitted in an R.C.4 zone.

Petitioners appealed to the Baltimore County Board of Appeals (hereinafter Board of Appeals). The Board of Appeals determined that respondent was not permitted to operate Peter Kahl Reptiles, Inc. in an R.C.4 zone. Respondent filed a Petition for Judicial Review in the Circuit Court for Baltimore County. The Circuit Court reversed the decision of the Board of Appeals, finding that respondent's business was a farming activity that was permitted by right in an R.C.4 zone.

Petitioners appealed to the Court of Special Appeals. The Court of Special Appeals affirmed the decision of the Circuit Court for Baltimore County (*Marzullo v. Kahl*, 135 Md.App. 663, 763 A.2d 1217 (2000)). Petitioners filed a Petition for Writ of Certiorari and respondent filed an Answer and Conditional Cross Petition for Writ of Certiorari. We granted both petitions. Petitioners presented two questions for our review:

1.  Whether the Court of Special Appeals erred in construing the BCZR [Baltimore County Zoning Regulations] to permit breeding of snakes under an expanded definition of "farm" as opposed to the specific definition of "animal boarding place[?]"

2. Whether the Court of Special Appeals erred in failing to give deference to the expertise of the County Board of Appeals in applying the BCZR pursuant to *Board of Physician v. Banks,* 354 Md. 59, 729 A.2d 376 (1999) as suggested by Judge Karwacki in his Dissenting Opinion[?]

Respondent presented two questions in his Conditional Cross Petition for our review:

1. Has the landowner acquired a vested right, pursuant to either the common law or local ordinance, to use the property to raise, breed and keep reptiles or snakes?

2. Is the County estopped from preventing the use of the property to raise, breed and keep snakes or reptiles?

We hold that the Circuit Court and the Court of Special Appeals failed to afford the findings of the Board of Appeals the proper deference when those courts held that the raising, breeding, and keeping of snakes and reptiles was a "farm" under the Baltimore County Zoning Regulations. Respondent's business was a use which is prohibited in an R.C.4 zone. We also hold that respondent has not acquired a vested right to conduct his business on the property and that the County is not estopped from preventing the use of the property to raise, breed, and keep snakes and reptiles.

## I. Facts

In 1991, respondent purchased a parcel of land to use as his residence. When respondent moved into the residence he used part of the residence to engage in his hobby of herpetology.[1] Specifically, respondent was engaged in the raising and breeding of pythons and boas.[2] Respondent's hobby eventually grew into a business and to accommodate its growth and to provide a proper facility for the care of the snakes, respondent

---

**1.** Herpetology is defined as "the branch of zoology dealing with reptiles and amphibians." *The Random House Dictionary of the English Language* 666 (Jess Stein ed., The Unabridged Edition, Random House 1983).

**2.** Both boas and pythons are members of the family *Boidae* and are large non-venomous snakes that kill their prey by constriction.

started to examine the feasibility of constructing a separate building on the same parcel of land for the purpose of breeding, raising, and selling snakes.

In July of 1994, respondent applied to the Baltimore County Department of Permits and Licenses for a "Holding Facility/Kennel/Wild Life" animal license for the purpose of breeding and research of boas and pythons in his residence. The Department of Permits and Licenses issued this license to respondent.

In 1994, respondent presented to the Department of Zoning and Development Management (hereinafter Department of Zoning)[3] a building plan and a site plan which included the proposed use and site for the new building. The parcel of land upon which respondent's residence was located and upon which respondent wanted to construct the building to use as a facility for the breeding and raising of the snakes was zoned R.C.4. An R.C.4 zone limits development to protect critical watersheds[4] and permits as of right, among other uses, a one-family detached dwelling and farms.[5] The Department of Zoning requested that the Baltimore County Agricultural

---

3. In 1995, the Department of Zoning and Development Management became the Department of Permits and Development Management.

4. Section 1A03.1 of the Baltimore County Zoning Regulations (hereinafter BCZR) provides that:

   "The County Council finds that major, high-quality sources of water supply for the entire Baltimore Metropolitan Area and for other neighboring jurisdictions lie within Baltimore County and that continuing development in the critical watersheds of those water supply sources is causing increased pollution and sedimentation in the impoundments, resulting in increasing water treatment costs and decreasing water storage capacity. The R.C.4 zoning classification and its regulations are established to provide for the protection of the water supplies of metropolitan Baltimore and neighboring jurisdictions by preventing contamination through unsuitable types or levels of development in their watersheds."

5. Section 1A03.3 of the BCZR provides that:

   "A. Uses permitted as of right. The following uses, only are permitted as of right in R.C.4 Zones:
   1. Dwellings, one-family detached.
   2. Farms and limited-acreage wholesale flower farms. . . ."

Land Preservation Advisory Board (hereinafter Advisory Board) review respondent's intended use and advise the Department of Zoning as to whether respondent's intended use qualified as a farm which was allowed by right in an R.C.4 zone.[6] At an April 12, 1995 meeting, the Advisory Board found that the building used for the breeding, raising, and sale of snakes qualified as a farm.[7]

The Department of Zoning then submitted respondent's request to construct a building to the Development Review Committee. The Development Review Committee granted respondent a limited exception under section 26–171(a)(7) of the Baltimore County Code, which provides for a limited exception to the public hearing process for "[t]he construction of residential accessory structures or minor commercial structures." In a November 25, 1996 letter from the Department of Zoning, respondent was told of the limited exception and that he could proceed with his building permit application.

---

**6.** In the inter-office correspondence from the Department of Zoning to the Advisory Board, the Director of the Department of Zoning stated that:

"This office is officially requesting verification of the legitimacy of a farm use on the referenced property. In the judgement of the Director and/or the Zoning Commissioner, in consideration of your findings, a special hearing may be required before the Zoning Commissioner prior to any zoning approvals."

**7.** The Baltimore County Agricultural Land Preservation Advisory Board's opinion was advisory; the opinion did not have any authority. Section 14–451 of the Baltimore County Code states that:

"**Sec. 14–451. Agricultural land preservation advisory board; created; duties and responsibilities; membership; terms of office.**

. . .

(c) *Duties and responsibilities.* The agricultural preservation advisory board shall be vested with and shall possess all the powers and duties in this article specified and also all powers necessary to properly carry out fully and factually, the provisions of this article. In addition to those duties prescribed by state law, the board shall:

. . .

(5) Review and make recommendations to the office of zoning administration and development management on zoning regulation proposals that relate to agricultural uses such as tenant buildings, farmer's roadside stands and other agricultural issues as the need arises."

In January of 1997, respondent requested a building permit from the Department of Zoning for a 5,000 square foot reptile barn. This permit was approved on February 14, 1997. A second permit was issued on March 27, 1997 which allowed respondent to double the square footage of the barn by adding a basement level instead of a crawl space.[8] Respondent contracted in January of 1997 with Advanced Building Structures for the construction of the outer shell[9] of the reptile barn. Advanced Building Structures started construction on the outer shell on February 26, 1997 and finished the construction on April 29, 1997. At this point, the barn did not have a roof, windows, or siding. The barn was just a shell, with only a concrete floor and no interior walls. William Yost, a project manager for Advanced Building Structures, stated at the hearing before the Board of Appeals that the barn was 45% completed when the outer shell was finished at the end of April, 1997.

At the beginning of April of 1997, petitioner, Mrs. Marzullo, an adjoining property owner to respondent's property, and other neighbors contacted Mr. Carl Richards, a Supervisor in Zoning Review for the Department of Zoning, regarding the construction activities they observed on respondent's property. On April 16, 1997, Mr. Richards sent a letter to respondent that advised respondent as to the complaints from the neighbors about the permit that was issued for his reptile barn. The letter also stated that a petition for a special hearing for an interpretation as to whether a particular parcel is being used appropriately can be filed by any citizen. While such a petition had not actually been filed, Mr. Richards was advising respondent of the possibility.

On April 25, 1997, petitioners filed an appeal from the issuance of the second permit, which allowed for the construction of the basement in the reptile barn. This appeal was

---

8. In this particular case, the basement, it can be argued, was nevertheless a crawl space.

9. The outer shell of the reptile barn was from the footings up to the roofline.

dismissed by the Board of Appeals because, at the time, the Baltimore County Code only provided for an appeal by the applicant after a denial of a building permit.

On April 29, 1997, petitioners filed a Petition for Special Hearing under section 500.7 of the BCZR. Section 500.7 states that:

> "The said Zoning Commissioner shall have the power to conduct such other hearings and pass such orders thereon as shall, in his discretion, be necessary for the proper enforcement of all zoning regulations, subject to the right of appeal to the County Board of Appeals as hereinafter provided. *The power given hereunder shall include the right of any interested person to petition the Zoning Commissioner for a public hearing after advertisement and notice to determine the existence of any purported nonconforming use on any premises* or to determine any rights whatsoever of such person in any property in Baltimore County insofar as they are affected by these regulations." [Emphasis added.]

The petition stated that it was filed to determine "whether or not the Zoning Commissioner should approve in an RC 4 Zone, the use of the site for the breeding, raising and selling of reptiles."

On September 22, 1997, a hearing was held before the Zoning Commissioner of Baltimore County (hereinafter Zoning Commissioner) on the Petition for Special Hearing. In his Findings of Fact and Conclusions of Law, the Zoning Commissioner stated that the issue was whether respondent's use of the property qualified as a farm under the BCZR. If the use qualified as a farm, then it is a use by right and if the use was not as a farm, then it was not permitted, even by special exception. Section 101 of the BCZR defines a "Farm" as:

> "FARM—Three acres or more of land, and any improvements thereon, used primarily for commercial agriculture,[10]

---

**10.** *The Random House Dictionary of the English Language* 29 (Jess Stein ed., The Unabridged Edition, Random House 1983) provides that agri-

as defined in these regulations, or for residential and associated agricultural uses. The term does not include the following uses as defined in these regulations: limited-acreage wholesale flower farms, riding stables, landscape service, firewood operations and horticultural nursery businesses."

Respondent's property was more than three acres, so the Zoning Commissioner stated that the issue as to whether this was a farm was whether the property was being used for commercial agriculture. Section 101 of the BCZR defines "Commercial Agriculture" as:

**"AGRICULTURE, COMMERCIAL**—The use of land, including ancillary structures and buildings, to cultivate plants or raise or keep animals for income, provided that the land also qualifies for farm or agricultural use assessment pursuant to Section 8–209 of the Tax–Property Article of the Annotated Code of Maryland, as amended. Commercial agriculture includes the production of field crops, dairying, pasturage agriculture, horticulture, floriculture, aquaculture, apiculture, viticulture, forestry, animal and poultry husbandry, horse breeding and horse training and also includes ancillary activities such as processing, packing, storing, financing, managing, marketing or distributing, provided that any such activity shall be secondary to the principal agricultural operations."

The Zoning Commissioner determined that respondent was engaging in commercial agriculture by raising and keeping snakes for income. Therefore, he also determined that respondent's property was being used as a farm and he could continue with the use as it was a use permitted by right. Petitioners filed an appeal of the Zoning Commissioner's findings to the Board of Appeals.

Over the course of two days, a hearing was held before the Board of Appeals. The Board of Appeals issued an Opinion

---

culture is: "**1.** the science or art of cultivating land in the raising of crops; tillage; husbandry; farming. **2.** the production of crops, livestock, or poultry. **3.** agronomy."

on November 30, 1998, which stated that "the use of the subject site for the breeding, raising, and selling of reptiles is not permissible in the R.C.4 zone." The Board of Appeals found that respondent had not satisfied the definition of "Commercial Agriculture." The Board of Appeals stated that:

"Terms such as 'animal,' 'animal husbandry,' and 'domestic animal' need to rest interpretively on an *ordinarily accepted* definition as stated above. The Board does not disagree with the Zoning Commissioner or the Petitioner's analysis that a snake is an 'animal.' Testimony is uncontradicted that Kahl 'raises, breeds, keeps and markets' these animals (snakes). Is this practice, however, 'commercial agriculture'; and, further, is it the practice of 'animal husbandry'? 'Commercial agriculture' is defined under Section 101 [of the BCZR]. *Webster's* defines 'animal husbandry' as: '... A branch of agriculture concerned with the production and care of domestic animals ... the scientific study of the problems of animal production.' A 'domestic animal' may include '... any of the various animals ... which have been domesticated by man so as to live and breed in a tame condition.' *Webster* defines 'domestic' as '... relating to the household or family ... connected with the supply, service, activities of the household and private residences ... suited to the physical livability of a private dwelling.' And 'domestic' means to 'bring into a degree of conformity and comfortable accommodation ... to subject to control and service of man.'

Having heard the testimony and a review of the various exhibits and evidence, this Board has concluded that the Property Owner's use of the R.C. zoned land is an improper use, and hence illegal under present statutory law....

. . .

In reaching its decision, the Board has also given weight to the definitions assigned to significant terms which have been the subject of the various briefs submitted by Counsel. The first defect in the Property Owner's case is one involving 'the use of land' as it appears in the BCZR 'Farm' definition.... There was more than sufficient testimony and

evidence produced at the hearing that Mr. Kahl's reptile activities are not land-based or oriented. He does not employ the use of land (fields, forest, streams), nor is there any other crop, growth, production or animal raised primarily for food or fiber that even stretching [the] interpretation is for the benefit or extension of agriculture. The facts of the case clearly demonstrate that the raising, breeding, and marketing of the Boas and Pythons do not require the use of the land in an agricultural sense. The subject snakes are only outside of the subject building when 'sunning.' They are not dependent on the land or otherwise use the land, agriculturally, on which the building is situated. They exist almost exclusively within the constructed building and are not land dependent." [Emphasis added.]

The Board of Appeals then found that respondent also had not satisfied the definition of "Commercial Agriculture" because the land must qualify for farm or agricultural use assessment and respondent's property was assessed residential by the Department of Assessments and Taxation.

The Board of Appeals also found that respondent's activities did not satisfy the requirement of "animal husbandry." The Board of Appeals stated that:

"Exploring the matter further as to whether or not Mr. Kahl's activities include 'animal husbandry,' the Board also concludes that snakes are 'animals.' The Board also acknowledges that Mr. Kahl raises, breeds and sells animals (snakes). Animal husbandry, however, deals with the production and care of *domestic animals*. The question is one of whether or not Boas and Pythons are to be considered as 'domestic animals.' The term 'domestic' has previously been expounded in this opinion. Significantly, back in July 1994, Mr. Kahl applied for and received a permit for a 'holding facility/kennel/wild life animal license' naming the Peter Kahl Reptiles, Inc., as the facility (his residence) for the purpose of 'research and breeding' valid from July 1, 1994 through June 30, 1995. Article I, Section 6-1 'Definitions' defines 'Wild Animal' as:

'Any animal of a species that in its natural life is wild, dangerous, or ferocious and, though it may be trained and domesticated by the owner, will remain dangerous to the public at large.'

A 'farm animal' is defined as:

'Any animal being maintained for the production of food, food products, and fiber.'

Clearly, the Property Owner back in 1994 did not believe his operation fit the definition of a 'farm animal' facility, but rather one of a 'holding facility ... requiring the use of a wild animal license.' Mr. Kahl vividly described his attempts to demonstrate how Boas and Pythons could be domesticated. Yet, if left unattended and not fed on a regular and systematic basis, they are aggressive and will seek out food and prey by scent. What contemplates food or prey is anyone's guess, but one must conclude that they must [be] consider[ed] dangerous by nature of their size and capacity of constriction and causing death to prey. By definition, domestic animals cannot include any wild animal. While opinions may vary, the Board concludes that in ordinary parlance as well as by the dictionary the word 'domestic' means relating to the home or household and the word 'domesticated' means made domestic or converted to domestic use.

This Board, while recognizing Mr. Kahl's efforts to breed snakes as domesticated, does not agree that they fit the definition as viewed by the members of this Board *or the general public.* While the Board has concluded that Mr. Kahl's activities are an improper use in R.C.4 zone, it is the conclusion of the Board that present zoning classifications do permit such usage as a pet shop defined under Section 101 as 'a person or establishment that sells and/or offers to sell animals, whether as an owner, agent or on consignment, to the general public,' which permits the marketing of pets; and BCZR Section 270 provides appropriate zones where animal boarding places (Class A and Class B) are permitted. While not a use permitted by right or special exception in an R.C.4 zone, they are permitted by special exception in

R.C.2 zone by way of Bill 178–79, and 'animal boarding place' (Class B) is allowed by special exception, additionally, in D.R.1, D.R.2, D.R.3.5 and B.M. zones, as well as by right in B.R., M.L. and M.H. zones—but specifically prohibited in R.C.4, R.C.5, R.C.20, R.C.50, R.A., R.A.E.1 and 2, B.L. and M.L.R. zones. There are, therefore, ample locations for this type of commercial activity which is engaged in by Mr. Kahl. The present location, however, is not one of them." [Emphasis added.]

The Board of Appeals then addressed the last issue raised by respondent which was equitable estoppel. The Board of Appeals found that it lacked jurisdiction to resolve the issue; nevertheless, the Board of Appeals opined that based on the facts of the case and the relevant case law, respondent would not be entitled to equitable estoppel. Respondent filed a petition for judicial review of the decision of the Board of Appeals in the Circuit Court for Baltimore County.

After a hearing was held on November 10, 1999, the Circuit Court issued an Opinion and Order on November 16, 1999. The Circuit Court reversed the decision of the Board of Appeals. The Board of Appeals had determined that respondent could conduct his business in a zone that allows animal boarding places or pet shops. The Circuit Court determined that these were not appropriate zones for respondent's business and that respondent was engaged in commercial agriculture on a farm, so he could conduct his business in an R.C.4 zone as a matter of right. The Circuit Court then determined that petitioners should be estopped from challenging respondent's use of the land. The Circuit Court stated that, "[s]omewhere in the three years between initially contacting the Department of Permits and Development Management and prior to receiving notice of the special hearing, Kahl was justified in relying upon the approvals he had received from Baltimore County."

Petitioners filed an appeal to the Court of Special Appeals. The Court of Special Appeals held that respondent's facility is a farm as a matter of law. The Court of Special Appeals also held that respondent is not required to have his land assessed

agricultural, respondent's property must merely qualify for the agricultural use assessment. In conclusion, the Court of Special Appeals, remanding the action to the Board of Appeals, stated that:

"In conclusion, we hold that appellee's [respondent] snake facility is a place that uses the land to breed and raise animals for income, pursuant to the plain language of BCZR section 101. On remand, the Board must decide if appellee would qualify for the agricultural use assessment pursuant to section 8–209 of the Tax–Property Article, if appellee were to apply."

Petitioners then filed a Petition for Writ of Certiorari to this Court and respondent filed a Conditional Cross Petition for Writ of Certiorari. We granted both petitions.

## II. Discussion

### A. Standard of Review

In *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 729 A.2d 376 (1999), we examined an appellate court's role in reviewing an administrative agency. Judge Eldridge, writing for the Court, stated that:

"A court's role in reviewing an administrative agency adjudicatory decision is narrow, *United Parcel v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226, 230 (1994); it 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' *United Parcel,* 336 Md. at 577, 650 A.2d at 230. *See also* Code (1984, 1995 Repl. Vol.), § 10–222(h) of the State Government Article; *District Council v. Brandywine,* 350 Md. 339, 349, 711 A.2d 1346, 1350–1351 (1998); *Catonsville Nursing v. Loveman,* 349 Md. 560, 568–569, 709 A.2d 749, 753 (1998).

In applying the substantial evidence test, a reviewing court decides ' " 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.' " ' *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512, 390 A.2d

1119, 1123 (1978). See *Anderson v. Dep't of Public Safety,* 330 Md. 187, 213, 623 A.2d 198, 210 (1993). A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. *CBS v. Comptroller,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990). A reviewing court ' "must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence" and to draw inferences from that evidence.' *CBS v. Comptroller, supra,* 319 Md. at 698, 575 A.2d at 329, quoting *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834–835, 490 A.2d 1296, 1301 (1985). *See Catonsville Nursing v. Loveman, supra,* 349 Md. at 569, 709 A.2d at 753 (final agency decisions 'are *prima facie* correct and carry with them the presumption of validity').

Despite some unfortunate language that has crept into a few of our opinions, a 'court's task on review is *not* to " ' "substitute its judgment for the expertise of those persons who constitute the administrative agency," ' " *United Parcel v. People's Counsel, supra,* 336 Md. at 576–577, 650 A.2d at 230, quoting *Bulluck v. Pelham Woods Apts., supra,* 283 Md. at 513, 390 A.2d at 1124. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. *Lussier v. Md. Racing Commission,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996), and cases there cited; *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ('The interpretation of a statute by those officials charged with administering the statute is ... entitled to weight'). Furthermore, the expertise of the agency in its own field should be respected. *Fogle v. H & G Restaurant,* 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ [ex rel. Christ] v. Department of Natural Resources,* 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to

administrative agencies will often include the authority to make 'significant discretionary policy determinations'); *Bd. of Ed. For Dorchester Co. v. Hubbard,* 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ('application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the' legal issues)."

*Id.* at 67–69, 729 A.2d at 380–81 (footnotes omitted). In the case *sub judice,* the facts of the case are not in dispute; however, the Board of Appeals' interpretation and application of the BCZR is in dispute. As stated in *Banks,* even though the decision of the Board of Appeals was based on the law, its expertise should be taken into consideration and its decision should be afforded appropriate deference in our analysis of whether it was "premised upon an erroneous conclusion of law." [11] *Banks,* 354 Md. at 68, 729 A.2d at 380, quoting from *United Parcel Service, Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994).

Respondent contends that the appropriate standard of review is the substituted judgment standard. Respondent states that the decision of the Board of Appeals is not due any deference. Among other cases, respondent cites *Montgomery County v. Buckman,* 333 Md. 516, 636 A.2d 448 (1994) for the proposition that "[t]he agency's resolution of the legal question is not due deference...." We do not find the language in *Buckman* to support the proposition that the decision of an administrative agency is not due any deference.

### B. Commercial Agriculture

Petitioners contend that the Court of Special Appeals erred by failing to give the proper deference to the decision of the Board of Appeals and by substituting its judgment for that of

---

**11.** In Baltimore County, since at least 1978, the Board of Appeals has been charged with "all the functions and duties relating to zoning [appeals] described in Article 25A of the Annotated Code of Maryland." Baltimore County Charter, § 602(a). As such, its presumed expertise in interpreting the BCZR, developed over the ensuing years, is what gives weight to appropriate deference in our analysis of its legal reasoning in this matter.

the Board of Appeals in construing the BCZR. We agree with petitioners that the Court of Special Appeals did not properly defer to the presumed expertise of the Board of Appeals in interpreting the BCZR. Moreover, there was substantial evidence to support its findings and its conclusions.

The question before the Board of Appeals was whether respondent's business qualified as commercial agriculture under the definition of farm. If his business qualified as commercial agriculture then he would be able to conduct his business because a farm is a use permitted as of right in an R.C.4 zone. The Board of Appeals determined that respondent had not satisfied the definition of commercial agriculture,[12] because respondent was not using the land for the raising of animals. The Board of Appeals stated that "the raising, breeding, and marketing of the Boas and Pythons do not require the use of the land in an agricultural sense." The Board of Appeals also determined that respondent had not satisfied the definition of commercial agriculture because respondent's business was not animal husbandry as it was intended in the definition of commercial agriculture. The Board of Appeals found that respondent's snakes were wild animals as supported by respondent's application for the holding facility/kennel/wild life animal license in 1994 for his residence and as supported by the definitions of wild animal and domestic animal. The Board of Appeals determined that animal husbandry concerned domestic animals and that the

---

**12.** As stated, *supra*, commercial agriculture is defined in section 101 of the BCZR as:

> "**AGRICULTURE, COMMERCIAL**—The *use of land*, including ancillary structures and buildings, to cultivate plants or *raise or keep animals* for income, provided that the land also qualifies for farm or agricultural use assessment pursuant to Section 8–209 of the Tax–Property Article of the Annotated Code of Maryland, as amended. Commercial agriculture includes the production of field crops, dairying, pasturage agriculture, horticulture, floriculture, aquaculture, apiculture, viticulture, forestry, *animal and poultry husbandry*, horse breeding and horse training and also includes ancillary activities such as processing, packing, storing, financing, managing, marketing or distributing, provided that any such activity shall be secondary to the principal agricultural operations." [Emphasis added.]

snakes bred by respondent do not fit the definition of domestic animals.

We commence our analysis of the relevant aspects of the BCZR by attempting to ascertain the intent of the legislative body, in this case the County Council of Baltimore County. In *State v. Bell,* 351 Md. 709, 720 A.2d 311 (1998), we stated that:

"We have said that '[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought first in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater[/Havre de Grace, Inc.] v. Mayor [and City Council] of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1,2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute to determine legislative intent. *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor [and City Council] of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

. . .

This Court recently stated that 'statutory language is not read in isolation, but "in light of the full context in which [it] appear[s], and in light of external manifestations of intent or general purpose available through other evidence." ' *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (alterations in

original) (quoting *Cunningham v. State*, 318 Md. 182, 185, 567 A.2d 126, 127 (1989)). To this end,

> [w]hen we pursue the context of statutory language, we are not limited to the words of the statute as they are printed. . . . We may and often must consider other 'external manifestations' or 'persuasive evidence,' including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.
>
> . . . [I]n *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51 (1987), . . . [a]lthough we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning-what Judge Orth, writing for the Court, described as 'the legislative scheme.' [*Id.* at] 344–45, 524 A.2d at 59. We identified that scheme or purpose after an extensive review of the context of Ch. 549, Acts of 1984, which had effected major changes in Art. 27, § 297. That context included, among other things, a bill request form, prior legislation, a legislative committee report, a bill title, related statutes and amendments to the bill. *See also Ogrinz v. James*, 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning.

*Kaczorowski*, 309 Md. at 514–15, 525 A.2d at 632–33 (some citations omitted)."

*Id.* at 717–19, 720 A.2d at 315–16 (some alterations in original); *see Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 115–17, 753 A.2d 41, 48–49 (2000); *Riemer v. Columbia Medical Plan, Inc.*, 358 Md. 222, 235–36, 747 A.2d 677, 684–85 (2000); *Laznovsky v. Laznovsky*, 357 Md. 586, 606–07, 745 A.2d 1054, 1065 (2000).

The Baltimore County Planning Board (hereinafter Planning Board) was charged by the Baltimore County Council, in response to the number and the complexity of zoning regulations for farms and agriculture-related businesses, to study the situation. The County Council requested that the Planning Board propose amendments to the BCZR in order to clarify the various zoning regulations dealing with farming and agriculture related operations. A Final Report of the Planning Board was presented on October 17, 1991. The report was titled "Proposed Amendments to the Baltimore County Zoning Regulations Regarding Definition of Commercial Agriculture and Farm."

The Planning Board started the report by providing background as to why amendments were needed to the definition for a farm. The Planning Board stated that:

"The agricultural industry is changing dramatically. Consumer preferences and economic necessity are transforming the manner in which agricultural businesses are operated. More and more farmers are engaged in retail distribution in addition to production activities. For example, *The Pennsylvania Farmer*, a magazine geared towards the farming community, reports innovative business practices which have greatly increased farm revenues. One farmer raised his income by selling some of his fruits in fruit baskets and delivering them to nearby offices and homes, as well as shipping them via mail order. Another farmer began to process his crops into cider after a hailstorm downgraded his apples. Today he is blending his ciders with cranberries, cherries, grapes and fruits purchased from other farms and is producing 10,000 gallons per day. Different products are being tried out. An apiarian, who initially restricted his production to honey only developed a carob/cranberry bar utilizing honey and by-products from honey processing. Ocean Spray, the cranberry operative, became one of his major buyers. . . .

New types of crops are becoming commonplace. Farmers experiment with raising ornamental and edible fish, shellfish and aquatic plants for the wholesale and retail

trade. Hardier varieties of plants allow the cultivating of grapes in local climates and more County farmers are trying their hand in wine production. Today the uses are frequently included when agriculture is defined in zoning regulations.

All of the business practices listed above are far removed from traditional agricultural operations. Smaller parcels of land are used to produce higher yields with the aid of intensive application of pesticides. Agricultural crops are processed, packaged and stored on site and many producers adopt the same marketing and distribution principles as commercial and industrial operations. Other aspects indicative of the changes in the agricultural industry are reflected in the type of equipment used and the modes of chemical application. Often involved in processing and distribution, today[']s farmers are more likely to use heavy equipment. Some farmers own a fleet of trucks. Other farmers use airplanes to apply pesticides.

The industrialization of agriculture has enormous implications on land use and it is essential to acknowledge that reality in the proposed definition. Recognizing the transformation of agriculture, this report provides recommendations for updating the Zoning Regulations."

The Planning Board then went on to discuss the new definition of agriculture. The Planning Board stated that:

"Formulation of a separate definition for agriculture is essential to complete the proposed set of farm definitions. 'Agriculture' has a broader meaning than 'farm'. Comparable in concept to words like 'commercial', 'residential' and 'industrial', *'agriculture' represents a class of land uses* and thus accommodates operations which might be agricultural in nature but do not fit into the narrower, traditional farm definition. For example, riding stables, firewood operations, landscape operations do not qualify as farms yet they are related to agriculture.

. . .

The principal standard that sets agricultural uses apart is that land or structures and buildings are utilized to produce plants or raise animals for income. The proposed definition acknowledges that agriculture is an industrial use which involves such activities as storage, processing, marketing, distributing and financing, but qualifies that all of the above activities must be ancillary to the principal agricultural operation." [Emphasis added.]

The Planning Board then examined the old definitions of "farm" and discussed why a new definition for farm and commercial agriculture was needed. The Planning Board stated that:

"The Baltimore County Zoning Regulations presently offer two definitions for farm and two additional definitions, which describe different types of farms:

*Farm:* Three acres or more of land, and any improvements thereon, used primarily for commercial agriculture, including but not limited to: crop, dairy, stock and poultry farming; greenhousing, flower farms and nurseries, whether wholesale or retail, excluding a limited-acreage wholesale flower farm. {Bill No. 85, 1967.}

*Farm:* A single tract of land more than three acres, primarily devoted to agriculture, including but not limited to raising of crops, dairy, forestry, livestock and poultry farming; horse breeding, training and stabling, grazing, commercial greenhousing, flower farms and nurseries, whether wholesale or retail, excluding a limited-acreage wholesale flower farm and commercial or noncommercial riding stables. {Bill No. 98, 1975.}

*Farm, Satellite:* A tract of land owned by the farmer or another individual or individuals which is more than 5 acres, and is primarily devoted to productive agriculture, including but not limited to the raising of crops, forestry, dairy, or livestock grazing: provided that the products from these areas are processed on the site or are brought to and processed on the principal farm, as defined, or are processed in other appropriate areas. {Bill No. 98, 1975.}

The existing farm definitions are repetitive and obsolete and Planning Board recommends replacing them with a version which more accurately addresses the special needs of today's farming industry. Discussions with farm representatives revealed that Baltimore County has a continuum of different farm types, all of which can be grouped under the catchall of 'metrofarm'. They range from large scale field crop producers to small, intensively farmed operations. Farmers may conduct their business on a full-time or on a part-time basis and in addition to production, they may be involved in an array of industrial type activities.

The 'Farm, Satellite' definition has limited application. Its primary purpose is to accommodate individual farmers or farm cooperatives who own or lease non-contiguous parcels of land and who use the principal farm building or other appropriate areas for processing purposes. Planning Board believes that that form of land use is accommodated in the proposed farm definition and recommends deleting the Farm, Satellite definition.

Section 100 of the Baltimore County Zoning Regulations includes a fourth definition for small farms between three and ten acres which are either commercial or noncommercial operations. The definition of 'farmette' includes a livestock ratio table which is intended to control animal waste pollution and overgrazing on small lots.

> *Farmette:* A parcel of land more than 3 acres and less than 10 acres, devoted primarily to a single-family residence with associated agricultural uses such as commercial or noncommercial raising of farm produce, flowers, nursery stock, greenhousing and limited livestock [13] ...."

---

13. The livestock, fowl, and poultry listed in the livestock ratio table were horses, burros, cattle, sheep, goats, pigs, ponies, miniature horses, chickens, ducks, geese, pigeons, pheasant, and quail. Snakes were not listed as an animal that would be on a farmette and would need to be included in a ratio table to help control animal waste pollution.

The Planning Board then proposed a definition for "Commercial Agriculture" that was eventually enacted, without change, by the County Council by Bill No. 51–93 on April 19, 1993. This proposed and enacted definition is the same as the definition used by the Board of Appeals in the case at bar.

At the hearing before the Board of Appeals, petitioners presented testimony from two experts in the area of land planning. The first to testify was Paul Solomon, who, among other credentials, had worked for the Baltimore County Office of Planning and Zoning and the Baltimore County Department of Environmental Protection and Resource Management. Specifically, Mr. Solomon was the planner in charge of the implementation of the resource conservation zoning classifications, which included the R.C.4 zone. In his testimony, Mr. Solomon stated that:

"Q. Do you remember the question? Do you agree with the Zoning Commissioner's approach to the issues?

A. Yes, I recall the question. No, I do not agree with the Zoning Commissioner's opinion, nor the basis for it in this case.

Q. Why not, Mr. Solomon?

. . .

A. Well, there are several reasons that I base my answer on.

First, there's no apparent—it's not apparent he considered the evolution of the R.C. zones that took place and then the need for them, so forth, I think clearly sheds light on this issue of what is a farm.

Secondly, in the definition itself, the definition is now in the zoning regulations which was put in in '91.

Incidently, he didn't consider all the aspects of the definition which have to be taken together, and pulls out one word, basically, animals, and he does not consider the various types of agricultural described in that definition and how they relate to this exotic use.

He does not understand or consider the fact that land is the key component of the definition.

He does not consider the ancillary structures are just that. They are ancillary to the total agricultural use of the land.

He apparently did not consider the assessment requirement of that definition, since it's my understanding that this property is zoned residential and not agricultural.

He did not consider the report that was done in 1991 by the planning board which updated the definition as described here and provides a lot of insight into the meaning of this definition and the types of agriculture which the planning board and the County Council were alluding to.

That's a quick review. That's why I find fault with the Zoning Commissioner's decision in this case.

. . .

Q. Now, during the time the R.C. zones were under study, under your direction heading the committee you have just discussed, did you or your colleagues have a concept as to what animals would be considered as part of an agricultural operation?

A. Yes.

. . .

Q. Mr. Solomon, what did you have in mind when that terminology 'raise or keep animals for income' was included in the commercial agriculture definition?

A. Well, I must say, in all honesty, this definition is totally consistent with and actually reinforces the earlier definition.

But this definition is somewhat different, but with that footnote, the basis which we utilized consistent throughout the process was this activity involving these animals, farm animals, basically, was that it was land-based.

In other words, did it need land as a raw resource to function, or was it production of food and fiber?

So, basically, if either one of those conditions had been met, then the likelihood was that that particular use for that

livestock would qualify, and I think we were pretty steadfast in that regard.

Q. Now, for example, would breeding of dogs be included in this concept you just described?

A. No, it would not.

Q. Why not?

A. In the first place, it is not land-based. It doesn't require land for feed or even towards disposal of waste materials, anything of that type.

It is more of a suburban-urban type use involving kennels, so forth. Dogs are not food or fiber, so it passed neither aspects of the tests.

It is not land based, and it was not production of food or fiber.

. . .

Q. Now, you mentioned earlier in your testimony when you were discussing the agricultural—commercial agriculture definition in the Baltimore County zoning regulations, that—strike that.

There was a prior definition before the one that's currently in the zoning regulations, is that correct?

A. That is correct.

Q. And, in your opinion, does the current definition differ materially from the original definition of commercial agriculture?

. . .

A. It differs only in one regard, a very specific regard, that is, the newer definition requires that in order . . . to accommodate commercial agriculture, the land must qualify for the agricultural use assessment.

With that one difference, the definition is precisely, or is the same. And, in fact, reinforces the intent and meaning of the earlier definition by adding other agricultural uses such as aquaculture.

It's conspicuous here it does not add uses such as exotic pets, or other non-agricultural uses.

. . .

Q.  In your opinion—I will rephrase the question.  Does the planning board report [the October 17, 1991 report of the Planning Board discussed *supra*] suggest any change in the understanding of the term 'commercial agriculture' from a previous definition in the 1970s to the current definition in 1993, other than the change about the agricultural use assessment?

A.  No, it does not.

. . .

Q.  What are the changes that are contained in the planning board report of 1991?

A.  Well, the impetus of this report was that agriculture was evolving in the sense that there was some—involving some farming enterprises which were not covered under traditional agricultural.

They wanted to clarify.  They mentioned four agricultural uses of the land in particular which included the raising of grapes, called viticulture; the production of fish, which is aquaculture; forestry, which is simply reiterated from the earlier definition, and then the raising of bees.

And they felt that these should be added to the more traditional accepted uses because of the state of transition of agriculture. . . .

. . .

A.  Well, there's no indication in the report that they considered—there's no indication in the report in considering all of the various types of agricultural uses that they were aware of, including the ones they added, of course, in that review, they did not apparently entertain any notion of kennel or animal boarding place or exotic snake farms as being within the definition of agricultural use.

. . .

Q.  Are you familiar with the phrase 'animal and poultry husbandry'?

A.  Yes, I am.

Q. Based on your experiences in developing the agricultural zones in Baltimore County, what is your understanding of the term 'animal husbandry'?

. . .

A. Animal husbandry consists of production of livestock or the raising of livestock primarily for food, although in the case of the horse industry, for other uses as well, but it's also land-based.

Q. And in your opinion, does the operat[ion] conducted by Mr. Kahl consist of animal husbandry, or is it consistent with that definition?

. . .

A. No, it is not land-based. It is not land-based in any sense of the word.

. . .

Q. In preparing for the zoning case, is it appropriate to sometimes consult the Baltimore County Code for reference?

A. Yes, it is.

Q. And did you consult the Code in this case?

A. Yes, I did.

Q. What, if anything, did you find that may be relevant to the issues that we are discussing today?

A. In looking or in reviewing the County Code, I reviewed the Title VI, Article 9.

Title VI is entitled animals, and Article 9 refers to wild animals.

But in the definition section, it breaks down animals into various groupings. It breaks them down into domestic animals, cats and dogs, basically, or as an example. It distinguishes very clearly farm animals.

And then it includes a third category called wild or exotic animals. . . .

. . .

Q. Was the County Code helpful to you in forming your opinion in this case?

A. It was helpful, yes.

Q. In forming your opinion, did you make, and based on the testimony you heard, and in your review of the matters in this case, did you make a determination as to what category Mr. Kahl's raising and breeding and selling snakes would fit into?

A. Yes. It would fall under the wild or exotic animals. Not, obviously, farm animals.

. . .

Q. Why would it not fall into the definition of a farm animal under the Baltimore County code?

A. It states—the definition states farm animals means any animal being maintained for production of food, food product, and fiber, period.

That's the entire definition, and that's consistent with the definition or the expressed understanding we had when we developed the R.C. zones.

Q. Have you heard anything today concerning Mr. Kahl's operation though that would lead you to believe it is an agricultural operation?

A. No.

Q. Now, based on these experiences that you discussed with Baltimore County zoning laws, and based on your investigation in this case and the matters that you heard today, do you have an opinion whether the use requested by the petitioner qualifies as commercial agriculture?

. . .

A. I do have an opinion.

Q. What is that opinion?

A. It is that his operation does not qualify under the definition in the Baltimore County zoning regulations for commercial agriculture.

Q. What do you base that opinion on? If you could tell the Board.

A. I base it first on the definition itself, which in its entirety makes it very clear what animals are.

In the first instance, the definition starts out by saying 'the use of land,' so the livestock operation, the animal operation has to be land-based, which it is not in this case.

Then there's a comment after land. It goes on to say 'including ancillary structures and buildings,' which makes it very clear that any structures are ancillary or secondary to the actual use of the land.

Then it goes on to say 'to cultivate plants or raise or keep animals for income, providing that the land also qualifies for farm or agriculture or agricultural land use assessment.'

In this case, there is clear, clear evidence that it is presently not assessed for agricultural use. . . .

. . .

A. So I am now discussing the actual definition of commercial agriculture in trying to show where the use that's before this Board is not consistent with this definition.

Coming to the end of that definition, it lists, and it is updated, it lists based on the '90 changes to the definition which includes all types of agriculture, they list nine or ten forms of agriculture.

They take commercial agriculture. It includes production of field crops, dairying, pasturage, agriculture, horticulture, aquaculture, apiculture, viticulture, forestry and animal and poultry husbandry, horse breeding and horse training.

And then it includes ancillary activities such as processing packages, so forth.

But if the Zoning Commissioner would have taken a look at those uses, there is not a hint there it involves pets or exotic animals or anything of the kind.

. . .

Q. Mr. Solomon, my original question was, on what did you base your opinion? Is there anything else?

A. Yes.

Q. Other than what you have discussed?

A. In addition to the definition itself, the Zoning Commissioner, in my opinion, should have looked at the County

Code as far as looking at the definitions of animal, which very clearly distinguishes farm animals and other animals.

He should have considered the evolution and the process involving the construction of the R.C. zones, determined what, if any, meaning could be gleaned from that research.

He could have looked, should have looked at the Maryland assessment law to see how that was consistent with the definition.

So in concluding my answer to you question, he should have looked both within the definition in its entirety for enlightenment and consistency, and should have looked at the external office I alluded to, and the whole process of the R.C. zone.

Q. Finally, Mr. Solomon, based on your position in Baltimore County in doing the R.C. 4 zones and based upon your experience, was there ever any thought given to including raising, breeding reptiles, snakes, as a farming activity?

A. No, never."

Mr. Solomon also stated in his testimony that it was his opinion that respondent's business could be located in a zone that allowed an animal boarding place.

After the testimony of Mr. Solomon, petitioners presented Mr. Norman Gerber, who also was accepted as an expert in land planning. Mr. Gerber worked in the planning office in Baltimore County for thirty years and he was the Director of Planning for eight years. As the Director of Planning, Mr. Gerber had been involved with the R.C. zones legislation and the application of the legislation to the land. Mr. Gerber stated that in his opinion respondent's business could not be conducted in an R.C.4 zone, but Mr. Gerber stated that in his opinion respondent's business could be located in a zone that allowed an animal boarding place class B. Mr. Gerber stated that he disagreed with the Zoning Commissioner's decision and that he thought that the Zoning Commissioner overlooked the fact that there is a broad zone (animal boarding place class B) in which this use is permitted. Mr. Gerber stated that this

use does not meet the definition of a farm and that this use is not related to the land.

Respondent alleges that he is using the land in the same manner as poultry husbandry and aquaculture, two forms of commercial agriculture.[14]   At the hearing, the distinction was drawn between the two recognized forms of commercial agriculture in that they both provide food.   Respondent also alleges that he practices animal husbandry within the definition of commercial agriculture.   The Board of Appeals distinguished respondent's business because it involves wild animals, not domestic animals, and the definition of animal husbandry is the production and care of domestic animals.

█   After an examination of the record, we determine that there is substantial evidence in the record to support the Board of Appeals' decision to find that the breeding, raising, and selling of snakes is not a permissible use in an R.C.4 zone. There is no dispute as to the facts.   Moreover, the legislative intent, as evidenced by the County Council's adoption of the Planning Board's proposed amendments and the testimony as to the intent of the Planning Board, provided the Board of Appeals with substantial evidence to interpret and apply the statutes in the manner in which it did.   Examining the Board of Appeals' decision and giving the appropriate deference to the expertise of the Board of Appeals in interpreting the BCZR, we hold that the Board of Appeals' decision was not premised on an erroneous conclusion of law.

Furthermore, we have held that a change in a statute as part of a recodification will not modify the law unless the intent of the legislative body to change the law is clear.   In *Blevins & Wills v. Baltimore County*, 352 Md. 620, 642, 724 A.2d 22, 32–33 (1999), we stated that:

---

**14.**  The definition of commercial agriculture, stated *supra*, explicitly states that aquaculture and poultry husbandry are included as commercial agriculture.   The definition does not state that the raising, breeding, and selling of snakes—snake husbandry—is included as commercial agriculture.

"We have long recognized and applied the principle that 'a change in a statute as part of a general recodification will ordinarily not be deemed to modify the law *unless the change is such that the intention of the Legislature to modify the law is unmistakable.*' *Duffy v. Conaway*, 295 Md. 242, 257, 455 A.2d 955 (1983) (emphasis added); *In re Special Investigation No. 236*, 295 Md. 573, 458 A.2d 75 (1983). That is because the principal function of code revision 'is to reorganize the statutes and state them in simpler form,' and thus 'changes are presumed to be for the purpose of clarity rather than for a change in meaning.' *Bureau of Mines v. George's Creek*, 272 Md. 143, 155, 321 A.2d 748, 754 (1974), quoting from *Welsh v. Kuntz*, 196 Md. 86, 97, 75 A.2d 343, 347 (1950)."

Resolution number 29–90 of the County Council requested that the Planning Board propose "amendments to the Baltimore County Zoning Regulations in order to clarify the various zoning regulations dealing with farming, forestry activities, and agriculture related operations." There was not an intent on the part of the County Council to modify the law; the County Council was looking to clarify the law. Examining the previous definitions of farm in the BCZR that were clarified by the definition of farm and commercial agriculture, we cannot detect any intent of the County Council to change the meaning of the preceding definitions. The preceding definitions clearly do not include respondent's business as an activity that occurs on a farm. Moreover, there was no discussion before the Planning Board of extending any of the relevant definitions to include any new animals involved in new types of commercial agriculture that were not explicitly stated in the new definition. Clearly, snakes were not an animal that the Planning Board or the County Council considered as falling within the province of the definition of farm or commercial agriculture.

Furthermore, there are certain instances where it is appropriate to consider other factors when interpreting a statute, some of which were alluded to by the petitioners'

expert witness. They include the fact that we do not set aside common experience and common sense when construing statutes. Absurd constructions are to be avoided. Simply stated, in the absence of proof that the legislative body expressly intended otherwise, the terms "farm" or "farm animals" would not normally include pythons and boa constrictors. Pythons, boa constrictors, and, for that matter, snakes in general, are not "farm animals." One can breed, raise, and sell snakes, but you cannot farm them. A snake is no more the equivalent of chickens, pigs, cows, goats, and sheep, than are lions, tigers, and elephants. In arriving at this assumption, we do not rely on treatises, scientific documentation, or other published works; we rely on common sense. A snake, however loveable it may be to some, is not a farm animal unless legislatively declared to be such. A boa constrictor can be an animal on a farm, but that does not make it a "farm animal," any more than a fox on the way to raiding the hen house is a "farm animal."

We hold that the Court of Special Appeals failed to give the proper deference to the decision of the Board of Appeals. The decision of the Board of Appeals was supported by substantial evidence in the record and was not premised on an erroneous conclusion of law. The Court of Special Appeals erred in finding that respondent's business was a permitted use in an R.C.4 zone. The Court of Special Appeals should have affirmed the decision of the Board of Appeals.

## C. Vested right

■ Respondent contends that he has obtained a vested right to use his property to raise, breed, and keep reptiles or snakes. In his brief, respondent states that in order for him to have a vested right he must satisfy two prongs. The first prong is that there has to be a valid permit. The second prong is that substantial work has to be performed under the permit so that it would be discernable to a member of the general public that work under the permit was occurring. Respondent states that he has satisfied both of the prongs and has a vested right to use the property for his business.

Respondent fails to properly apply the prongs and to understand the circumstances of when a vested right occurs.

We examined the law of vested rights in *Prince George's County v. Sunrise Development Limited Partnership*, 330 Md. 297, 623 A.2d 1296 (1993). In *Sunrise*, we stated that:

"The third stream of cases involves the issue of vested rights, per se. By a per se vested rights case we mean one invoking '[t]hat doctrine, which has a constitutional foundation [and which] rests upon the legal theory that when a property owner obtains a lawful building permit, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations.' *Prince George's County v. Equitable Trust Co.*, 44 Md.App. 272, 278, 408 A.2d 737, 741 (1979).

The first case in this Court squarely raising that doctrine is *Richmond Corp. v. Board of County Comm'rs for Prince George's County*, 254 Md. 244, 255 A.2d 398 (1969). There the developer owned commercially zoned land abutting residentially zoned land. The developer had expended large sums of money in acquisition of the property and in preparing plans, leases and specifications for a shopping center on the commercially zoned tract that would utilize the residentially zoned tract for parking. Before there was any construction on the ground, the zoning ordinance was amended to require a special exception for parking on residentially zoned property as auxiliary to a commercial use. In rejecting a contention that the developer had vested rights under the earlier zoning, we borrowed from the law of nonconforming uses the concept of public knowledge in the neighborhood of the use, saying:

'In Maryland it is established that in order to obtain a "vested right" in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must

proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use. *See Feldstein v. LaVale Zoning Board,* 246 Md. 204, 210, 227 A.2d 731, 734 (1967), indicating that [*Mayor & City Council v.*] *Shapiro*[, 187 Md. 623, 51 A.2d 273 (1947) ] as well as *Chayt v. Board of Zoning Appeals,* 177 Md. 426, 9 A.2d 747 (1939), established as one of the tests for determining the existence of a nonconforming use "is whether such use was known in the neighborhood." '

254 Md. at 255–56, 255 A.2d at 404.

In *Rockville Fuel & Feed Co. v. Gaithersburg,* 266 Md. 117, 291 A.2d 672 (1972), we said that '[s]uch a "vested right" could only result when a lawful permit was obtained and the owner, in good faith, has proceeded with such construction under it as will advise the public that the owner has made a substantial beginning to construct the building and commit the use of the land to the permission granted.' *Id.* at 127, 291 A.2d at 677; *see also County Council for Montgomery County v. District Land Corp.,* 274 Md. 691, 337 A.2d 712 (1975)."

*Id.* at 312–13, 623 A.2d at 1303–04 (alteration in original); *see Sycamore Realty Co., Inc. v. People's Counsel of Baltimore County,* 344 Md. 57, 67, 684 A.2d 1331, 1336 (1996).

In the case *sub judice,* respondent obtained a permit and completed substantial construction; however, he is not entitled to have a vested right because there has been no change, applicable to his case, in the zoning law itself and the permit was improperly issued. When respondent obtained his permit and started construction, the BCZR was the same as when petitioners filed for a hearing before the Zoning Commissioner. The Zoning Commissioner and later the Board of Appeals were not making a subsequent change to the BCZR, they were just interpreting the BCZR as it was already enacted. Based on the decision of the Board of Appeals that we are affirming, respondent's permit was not a lawful permit because he could not lawfully conduct his business in an R.C.4 zone.

■ Respondent did not satisfy the first prong because his permit was not proper. Additionally, he was not being subjected to a subsequent change in the zoning regulations. Generally, in the absence of bad faith on the part of the remitting official, applicants for permits involving interpretation accept the afforded interpretation at their risk. Therefore, respondent has not obtained a vested right to conduct his business on the property.

## D.   Equitable estoppel

■ We examined the doctrine of equitable estoppel and its application against a municipality in *Inlet Associates v. Assateague House Condominium Association*, 313 Md. 413, 545 A.2d 1296 (1988), when we stated that:

"There is no settled rule in this country as to when, and under what circumstances, equitable estoppel is available against a municipal corporation. *Permanent Fin. Corp. v. Montgomery Cty.*, 308 Md. 239, 518 A.2d 123 (1986). Our cases have continually applied the definition of equitable estoppel set forth in 3 J. Pomeroy, *Equity Jurisprudence* § 804 (5th ed. 1941) as follows:

'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, or contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.'

. . .

Unlike *Permanent Fin.*, the present case does not turn on the ambiguity vel non of a county ordinance which was subject to two reasonable interpretations. Rather, we are now considering whether a municipality may be estopped when its city council, in clear violation of a fundamental charter requirement that it act by ordinance, with all the

deliberate safeguards attendant upon the legislative process, purports to bind the municipality through passage of a simple resolution which is neither subject to executive approval nor veto nor the public right of referendum. Of course, no principle is better settled than that persons dealing with a municipality are bound to take notice of limitations upon its charter powers. *See City of Hagerstown [v. Long Meadow Shopping Center], supra,* 264 Md. [481] at 493, 287 A.2d 242; *Hanna v. Bd. of Ed. of Wicomico Co.,* 200 Md. 49, 57, 87 A.2d 846 (1952); *Gontrum v. [Mayor and] City [Council] of Baltimore,* 182 Md. 370, 375, 35 A.2d 128 (1944 [1943]). Consequently, '[e]veryone dealing with officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers, and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority.' *Lipsitz v. Parr, supra,* 164 Md. [222] at 228, 164 A. 743. *See also Berwyn Heights, supra,* 228 Md. at 279, 179 A.2d 712. Therefore, the doctrine of equitable estoppel 'cannot be . . . invoked to defeat the municipality in the enforcement of its ordinances, because of an error or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment.' *Lipsitz,* 164 Md. at 228, 164 A. 743. In the same vein, McQuillin, *supra,* § 29–104c states that estoppel cannot make lawful a municipal action which is beyond the scope of its power to act or is not executed in compliance with mandatory conditions prescribed in the charter. In other words, the doctrine of equitable estoppel cannot be invoked to defeat a municipality's required adherence to the provisions of its charter simply because of reliance upon erroneous advice given by an official in excess of his authority. *See [Mayor and] City [Council] of Baltimore v. Crane, supra,* 277 Md. [198]at 206, 352 A.2d 786. When, as here, it is a patent violation of one of the most fundamental provisions of a municipal charter—that its legislative body, when required to act in a legislative capacity, do so only by

ordinance—it cannot matter that a party relies upon erroneous official advice to its detriment."

*Id.* at 434–37, 545 A.2d at 1307–08 (alteration in original).

Respondent contends that Baltimore County should be estopped from preventing him from using his property to raise, breed, and keep reptiles and snakes. Respondent states that it would be "fundamentally unfair" to not allow him to use the property for his business after he obtained permit approval and had substantially constructed the reptile barn before he knew the petitioners might file for a special hearing. Respondent contends that he relied on the permit approval to order materials and enter into a contract for construction.

In *Lipsitz v. Parr*, 164 Md. 222, 164 A. 743 (1933), Mr. Lipsitz brought a proceeding against Mr. Parr, the buildings engineer of the Mayor and City Council of Baltimore City, and the named members of the board of zoning appeals. Mr. Lipsitz had obtained a permit to construct a building to manufacture ice. The permit granted Mr. Lipsitz permission to construct the building and the permit carried an indorsement that the use of the land was in conformity with the provisions of the zoning ordinance. The land upon which the ice factory was to be constructed was actually in a zone where an ice factory was prohibited. Mr. Lipsitz was notified by letter that the permit was revoked and annulled as being in violation of the law and as having been issued by a mistake of a clerk. Mr. Lipsitz had already leased the premises to a tenant for a term of five years and had started construction on the building. Mr. Lipsitz alleged that the municipality was barred from denying his right to use the premises as an ice factory by estoppel.

The Court held that the doctrine of estoppel did not apply because a municipality is not estopped from enforcing its zoning regulations when a permit had been issued by mistake by its officer or agent. The Court held that:

"A municipality may be estopped by the act of its officers if done within the scope and in the course of their authority or employment, but estoppel does not arise should the act

be in violation of law. Paragraph 31 of the ordinance forbade the officials of the municipality to grant the permit which the plaintiff asked and obtained; and paragraph 41 made it a misdemeanor for the plaintiff to use his premises as a factory to make ice as the invalid permit purported to empower.

If the provision of the ordinance be constitutional, it was therefore unlawful for the officers and agents of the municipality to grant the permit, and it would be unlawful for the licensee to do what the purporting permit apparently sanctioned. A permit thus issued without the official power to grant does not, under any principle of estoppel, prevent the permit from being unlawful nor from being denounced by the municipality because of its illegality. In the issuance of permits pursuant to the ordinance at bar, the municipality was not acting in any proprietary capacity nor in the exercise of its contractual powers, but in the discharge of a governmental function through its public officers of limited authority, and *the doctrine of equitable estoppel cannot be here invoked to defeat the municipality in the enforcement of this ordinances, because of an error or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment.* Every one dealing with the officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers, and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority.

So, even where a municipality has the power, but has done nothing, to ratify or sanction the unauthorized act of its officer or agent, it is not estopped by the unauthorized or wrongful act of its officer or agent in issuing a permit that is forbidden by the explicit terms of an ordinance.

It follows that, because the ordinance prohibited the use of the premises in question for the making of ice by artificial methods, any permit issued would be void, and the person who received the permit would derive no benefit, and whatever he might do in pursuance of this permission would be

at his own risk and loss, unless the prohibition itself were void."

*Id.* at 227–28, 164 A. at 745–46 (citations omitted) (emphasis added).

In *Town of Berwyn Heights v. Rogers,* 228 Md. 271, 179 A.2d 712 (1962), Phillip Rogers, a home builder, began construction of a residence in Berwyn Heights. Mr. Rogers had not started construction until he had received building permits from both the county's building inspectors and the Town of Berwyn Heights' [15] inspectors. The construction was in compliance with the permits; however, the Town of Berwyn Heights concluded that a mistake had been made in the issuance of the permits so that the residence was being built in violation of a zoning ordinance. The Town of Berwyn Heights filed suit to enjoin the construction of Mr. Rogers.

Mr. Rogers alleged that the Town of Berwyn Heights was estopped from filing suit because it and the county had issued Mr. Rogers building permits, and Mr. Rogers had expended substantial amounts of money in partially constructing the residence. The Court held that:

"Some authorities hold that the principle of estoppel does not apply against a city, but the majority rule is to the effect that the doctrine of estoppel in pais is applied to municipal, as well as to private, corporations and individuals, at least where the acts of its officers are within the scope of their authority and justice and right requires that the public be estopped. And it has been held that municipalities may be estopped by reason of the issuance of permits. However, the cases and text-writers very generally state that a municipality is not estopped to set up the illegality of a permit. And the issuance of an illegal permit creates no 'vested rights' in the permittee. *We have held above that the permits issued to the appellee were in violation of the zoning ordinance; consequently they were unlawful and*

---

**15.** The Town of Berwyn Heights was, and remains, a municipal corporation.

*did not estop the appellant [the Town of Berwyn Heights]
from prosecuting this suit."*

*Id.* at 279–80, 179 A.2d at 716 (citations omitted) (emphasis added).[16]

While we are sympathetic to the plight in which respondent has found himself, we hold that the county is not estopped from enforcing the BCZR as it was applied by the Board of Appeals. We have held, generally, that permits that have been issued that are in violation of the zoning ordinances are unlawful and cannot be grounds for estopping a municipality from the enforcement of the ordinance. We stated in *Lipsitz* that "the doctrine of equitable estoppel cannot be here invoked to defeat the municipality in the enforcement of its ordinances, because of an error or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment." *Lipsitz,* 164 Md. at 227, 164 A. at 746.

### III. Conclusion

We hold that the Court of Special Appeals failed to give appropriate deference to the expertise of the Board of Appeals in interpreting the BCZR. Furthermore, there was substantial evidence in the record to support the findings made by the Board of Appeals and the decision made by the Board of Appeals was not based on an erroneous conclusion of law. The Board of Appeals properly found that respondent's business does not satisfy the definition of "commercial agriculture," because respondent was not involved in the use of the

---

**16.** There have been cases where we have granted equitable estoppel against a municipality; however, they are distinguishable from the case at bar. In *Permanent Financial Corp. v. Montgomery County*, 308 Md. 239, 518 A.2d 123 (1986), a builder sought to estop the county from asserting that the top floor of a building exceeded a height control imposed by local zoning ordinances. We held that the county was estopped because the builder had designed and constructed the building in reliance on the building permits and the counties long-standing and reasonable interpretation as to how a building's height should be calculated. The record in the case at bar does not indicate any long-standing practice in Baltimore County to include snakes as farm animals or the raising and breeding of snakes as commercial agriculture. To the extent there is any such evidence, it is to the contrary.

land or in animal husbandry. Also, it was not the intent of the County Council when enacting the definition of "commercial agriculture" to include activities like the breeding, raising, and selling of reptiles. Therefore, respondent's business does not satisfy the definition of "farm" and respondent is unable to conduct his business in an R.C.4 zone.

Respondent is not entitled to a vested right to use his property to raise, breed, and keep reptiles and snakes. Because we have held that respondent's business is not a use allowed in an R.C.4 zone, respondent cannot satisfy the first prong of vested rights jurisprudence because his permit was never properly issued. The permit was in violation of the BCZR. Respondent also is not entitled to a vested right because the concept of vested rights generally protects a party from a subsequent change to a zoning ordinance after construction under a valid permit has commenced. In the case at bar, there was not a subsequent change in the BCZR, there was only an interpretation of a statutory provision that existed at the time the alleged right vested, which interpretation was not contrary to any prior interpretation by the BCZR of that provision or local common practice and usage regarding the provision.

We also hold that Baltimore County is not estopped from preventing respondent from using his property to conduct his business by enforcing the BCZR as it was interpreted by the Board of Appeals. Respondent knew, or should have known, that the permit obtained was not proper when it was issued; it cannot be grounds for estopping Baltimore County from enforcing the BCZR.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH DIRECTIONS TO AFFIRM THE DECISION OF THE BOARD OF APPEALS FOR BALTIMORE COUNTY;**

**COSTS IN THIS COURT AND IN THE COURT OF SPE-CIAL APPEALS TO BE PAID BY RESPONDENT.**